**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Sheldon SERLIN and Marvin Phillips, Defendants-Appellants.**

**Nos. 75–1661, 75–1662.**

United States Court of Appeals, Seventh Circuit.

Heard Feb. 24, 1976.

Decided July 6, 1976.

Rehearing Denied Aug. 2, 1976.

Sherman L. Lewis, Anna R. Lavin, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Robert M. Stephenson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, TONE and BAUER, Circuit Judges.

BAUER, Circuit Judge.

This is a mail fraud case wherein nine persons and two corporations were charged with violating 18 U.S.C. 1341.[1] Both defendants[2] were found guilty by a jury and sentenced to various terms of imprisonment and probation. On appeal the defendants have raised a multitude of legal issues alleging principally: government miscon-

---

1. 18 U.S.C. 1341 provides, *inter alia*:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Services, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. The indictment in this case also named other defendants, Adolph C. Schwarz, William Patton, Kenneth Billingsley, Cyril Green, Alan Edelson, Donald Benjamin, Gilbert K. Liss, and the corporations, Cardet International, Inc., and Mercantile Loan Corporation. Serlin and Schwarz were found guilty on all counts. Phillips was convicted on Counts 1, 3, 7, 8, 13, 14 and 15. Billingsley was convicted on Counts 1, 8 and 13. Patton and Green were acquitted by the jury. The court granted Edelson, Benjamin, Liss and Mercantile Loan Corporation's motions for judgment of acquittal filed at the close of the government's case. Serlin was sentenced to 18 months and Phillips to 1 year. Both also received probation periods.

duct, a failure to prove a crime under the mail fraud statute, and violation of their due process rights by various procedural and evidentiary rulings in the trial court. We affirm.

## I. THE FACTUAL BACKGROUND

The indictment charged that the defendants conducted a scheme to defraud under the corporate names of Cardet International, Inc. ("Cardet") and Mercantile Loan Corporation ("MLC") between July 1971 and December 1972. Basically, the indictment alleged that the defendants sold purported distributorships or franchises of Cardet merchandise to victims of the mail fraud. In order to finance the purchase of these franchises, the defendants arranged for the buyers to obtain loans from MLC.

There is a wealth of information in the record evidencing how the defendants induced persons to buy franchises. Fifteen franchisees testified as to how they were induced to buy a Cardet franchise. A typical buyer was set up under a rather patterned scenario. Initially, the victim either received an advertisement about Cardet at home or read a Cardet advertisement in the newspaper. These ads described Cardet's business of selling top quality consumer products and appliances. Cardet franchisees or distributors would be granted an exclusive sales territory wherein each month they would distribute brochures outlining selections of Cardet products to residents of the franchise area who could then order the Cardet products from the "convenience and comfort" of their own homes. For every order placed in the distributor's area a commission would be paid.

Cardet's advertisements exploited the relationship of former professional football player Dick Butkus with the company,[3] emphasized the great financial potential of Cardet franchises, and requested interested persons to send in an attached business reply card. Sometime thereafter, the prospect either went to a Cardet office or a Cardet representative appeared at his home. At that point various representations were made by the defendants and others to the prospective buyers: that Cardet was a national enterprise with offices in major cities like Atlanta, Chicago, Dallas, Houston, Los Angeles and Philadelphia; that Cardet had large distribution warehouses in Des Plaines and Northbrook, Illinois, both having a fleet of delivery trucks available; that Cardet had annual sales in excess of a million dollars; that former football player Dick Butkus had a major financial interest in Cardet; that Cardet franchisees generated large profits; that little, if any, cash investment by the franchisee was necessary; that Cardet provided the financing for the franchise; that the only collateral necessary for financing was the franchise itself; that franchisees were able to repay loans within a year of purchase; that Cardet provided franchisees with catalogs listing hundreds of items available; that Cardet conducted marketing studies for the franchisees to improve their distribution; that Cardet provided an extensive training program; that the products sold by Cardet included cosmetics, appliances, cars and yachts; that Cardet could sell its products, obtained directly from manufacturers, at a 50% discount; and, that a buy-back agreement allowed disenchanted franchisees to resell the franchises to Cardet at the market value. The defendants Serlin and Phillips actively participated in making these representations.

---

**3.** Dick Butkus is a former football player for the Chicago Bears who achieved substantial local and national notoriety. Butkus allowed his name to be used to promote various businesses. Butkus' endorsements were handled by John Childers, owner of Talent Network. In July 1971 Serlin met with Childers to discuss Cardet's use of the name of a prominent sports figure. Butkus was selected, and in January 1972 he signed a letter sent to Serlin to be used in promoting Cardet. Without investigating the nature and quality of Cardet's business he endorsed it stating, "I have chosen Cardet International for my future, and I would recommend it to everyone." Butkus had not chosen Cardet for his future. Despite this apparent misrepresentation in advertising, Butkus escaped all criminal charges. Nevertheless he has been named in a civil proceeding by victims of Cardet's scheme to defraud.

In fact, there was no nationwide network. Similarly, there were no Cardet offices in Atlanta, Dallas, Houston, Los Angeles and Philadelphia, no Des Plaines or Northbrook warehouses, no trucks, no profits, no marketing studies, no training programs, nor any contracts with product manufacturers to sell goods at a 50% discount. Butkus' only connection with Cardet was the license agreement giving Cardet the use of his name and image to promote its business. Franchisees were required under the loan agreements to use their homes as collateral. No franchisee could repay the loan within a year without incurring substantial prepayment interest charges. Of course, Cardet never repurchased any of the franchises from the disappointed buyers.

The evidence presented disclosed that the so-called business of the defendants had all the earmarks of a classic fraud. At the initial presentation the prospective buyer was shown "pitch books" in which appeared bogus letters from satisfied franchisees and other misleading promotional materials. The prospect was questioned about his personal and financial situation while photographs were taken of his home. Ostensibly the photos were to be submitted to Cardet demonstrating that the buyer had adequate facilities. Actually the home photos would be submitted to MLC to show that there was satisfactory collateral for the loan. The prospective buyers were never informed that their homes were to be used as collateral.

After an agreement on the sale of the franchise was reached, the victims were driven to the MLC loan offices in a new Lincoln Continental Mark IV. In many instances, representations were made to the prospect that they could purchase the same type of car from profits earned from a Cardet franchise. One witness testified that, pursuant to Serlin's request, he acted as a "set-up man"; that is, he would unexpectedly arrive during an initial sales presentation with prospective buyers and casu-

ally mention how well he had done in operating his Cardet franchise. Another witness related that the defendant Phillips expressed his philosophy of selling as follows:

"The way it is done in this business, you give them a little and then you take it away. Then you give them a little bit more and you keep taking it away. By the time they come in here to close, they are so anxious to give you their money that there is no difficulty in closing whatsoever." [4]

After arriving at the loan office, the defendants and employees of MLC continued to proclaim Cardet as a great business venture. The loan papers were hurriedly presented for signing. Reading of the documents was discouraged. Misrepresentations were made about the nature of the collateral for the loan, the rate of interest, the amount of prepayment penalties, and the time in which the loan would be repaid. The buyers were never told that Cardet received a finder's fee for each loan. Although requests were made for copies of the loan papers, none were produced.

Suffice it to say, the franchisees failed. There were many incurred expenses but little or no profits. Numerous purchasers did not even receive merchandise. Their loans ultimately required a total repayment of approximately $9,000 on an initial principal amount of $5,000.

## II. THE RECORD CONTAINS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING OF GUILT.

██ Despite the lengthy and detailed record in this case, which outlines the participation of the defendants in a scheme to defraud, the defense argues that there was insufficient evidence to establish the defendants' guilt beyond a reasonable doubt. This claim arises because much of the evidence, an estimated 80%, dealt with the MLC defendants and the loan transactions which were admitted to show their guilt. Since the MLC defendants were acquitted,

4. Testimony of witness Donald E. Yoder at transcript p. 2639.

the defendants argue they were prejudiced by this evidence.[5]

■ However, the evidence would have been admissible against the defendants, regardless of the status of the MLC defendants, because the indictment charged an overall scheme or artifice to defraud. This case is analogous to a conspiracy trial in which the evidentiary rule is well-established that statements and acts of co-conspirators are relevant and admissible.

Justice Clark was confronted with this problem in *United States v. Cohen*, 516 F.2d 1358 (8th Cir. 1975). In *Cohen*, a mail fraud case, the facts were remarkably similar to the present situation. Justice Clark stated for the Eighth Circuit:

"Once the appellant contrived this scheme to defraud and set it in motion, he was engaged in a continuous offense of causing the mails to be used in furtherance thereof, an offense which is not mitigated by his mere physical absence. In general, proof of a mail fraud scheme involving two or more persons is analogous to the nature of proof in a conspiracy, see *United States v. Grow*, 394 F.2d 182, 203 (4th Cir. 1968), and the same may be said of withdrawal from a mail fraud scheme. An individual participant in a fraud scheme will be held liable for the acts of his agents and co-schemers that are within the general scope of the scheme, see *United States v. Cohen*, 145 F.2d 82 (2d Cir. 1944), unless as in a conspiracy, he undertakes some affirmative act of withdrawal. See *Glazerman v. United States*, 421 F.2d 547 (10th Cir. 1970); *Reisman v. United States*, 409 F.2d 789 (9th Cir. 1969); *Blue v. United States*, 138 F.2d 351 (6th Cir. 1943)." 516 F.2d at 1364.

But totally apart from the evidence concerning the MLC defendants[6] there is a wealth of evidence to support the jury's finding of guilt. In October 1971 Serlin sold Donald Oksas a Cardet franchise. He made numerous false and misleading statements. After Oksas discovered that the entire Cardet operation was a sham, Serlin induced Oksas to join the scheme. Serlin told Oksas that, for Cardet to succeed, prospects had to be convinced that Cardet was an established enterprise; that franchises were making a profit. Serlin told Oksas that he had "to swing along to get along to make money."

Another witness (Stein) testified that Serlin induced him to act as a "shill". As stated previously, his task was to casually arrive on the scene while a sales pitch was being made to a prospect. After being introduced and explaining his phony reason for interrupting the discussion, he would offhandedly remark how well his franchise was operating. He was engaged in this deceptive colloquy at Serlin's request. In fact he was not operating a successful franchise.

---

**5.** The defendants have also argued that the trial judge erred initially in denying a motion for severance. In order to obtain a severance the defendant must show actual prejudice, *i. e.*, "That he will be unable to obtain a fair trial without severance, not merely that a separate trial will offer a better chance of acquittal." *United States v. Blue*, 440 F.2d 300, 302 (7th Cir. 1971); *United States v. Kahn*, 381 F.2d 824, 838 (7th Cir. 1967); *United States v. Bastone*, 526 F.2d 971 (7th Cir., decided December 8, 1975). The trial judge did not err in denying the original motion since there was no showing of actual prejudice. On appeal the government maintains that there was no apparent basis in the record for the trial court granting the motion for judgment of acquittal. The propriety of the granting of that motion is not appealable, and thus we have not considered it except as it relates to a review of the denial of sever-

ance. Because we believe there was one overall scheme implicating the MLC defendants, the severance motion was properly denied. In any event the ultimate decision to grant or deny severance rests "within the sound discretion of the trial judge", *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), and on appeal the defendant must show an abuse of that discretion. *United States v. Tanner*, 471 F.2d 128, 137 (7th Cir. 1972).

**6.** Assuming *arguendo* that the challenged evidence of the MLC defendants was not admissible against Serlin and Phillips, the trial court nevertheless instructed the jury to disregard "the statements of acts" of Edelson, Benjamin and Liss in determining Serlin's and Phillips' guilt or innocence.

Defendant Phillips also engaged in making false representations on a massive scale. The defense seeks to legitimize these outright lies by claiming that the defendants had flamboyant style and that certain stories were told to establish rapport with the prospective buyers. They claim that the evidence was insufficient to demonstrate a criminal intent on the part of the defendants. Citing *United States v. Scott*, 263 F.2d 398 (5th Cir. 1959), and *Telex, Inc. v. Schaeffer*, 233 F.2d 259 (8th Cir. 1956), they point out that the statements using puffing, statements of unfulfilled promises, predictions about the future course of business, high pressure tactics, and erroneous conjectures do not necessarily amount to criminal intent to defraud.

■■ But the evidence in this case shows much more than mere "puffing". There was an obvious scheme built upon outright deception. Serlin was president and Phillips was vice-president of Cardet, which was the company central to the scheme. The positions occupied by the defendants and the magnitude of the misrepresentations alone may well have been sufficient proof of their involvement in a mail fraud violation. *United States v. Cohen*, 516 F.2d 1358, 1367 (8th Cir. 1975); *United States v. Joyce*, 499 F.2d 9 (7th Cir. 1974). Looking beyond the relationship of the defendant officers to the company, there is even more direct evidence of guilt. On appeal we cannot now overlook the very admissions of fraud in the statements made by Serlin: " . . . swing along [with the fraud] to get along to make money"; or, by Phillips: " . . . give them a little and then you take it away".

■■ In attempting to prove the defendants' guilt the government also presented substantial evidence of omissions of material fact which allegedly induced prospects to enter into MLC loan agreements. Serlin argues that omissions of fact do not constitute a violation of the mail fraud statute, 18 U.S.C. 1341. In a general sense the mail fraud statute "is a broad proscription of behavior for the purposes of protecting society." *United States v. Ow-*

*ens*, 231 F.2d 831, 832 (7th Cir. 1956). It was intended to prohibit "conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir. 1965), citing *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958). Although the literal language of the statute ("any scheme or artifice to defraud, or obtaining money or property by means of false or fraudulent pretenses") does not include omissions, at least one conviction, *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), has upheld the use of an omission to establish a violation of the mail fraud statute. In any event, this issue is not of primary concern in this case since there is ample evidence of actual misrepresentation to corroborate that the passive omissions were intended to defraud and further the scheme.

## III. THE MAILINGS OUTLINED IN THE INDICTMENT WERE SUFFICIENT TO DEMONSTRATE A VIOLATION OF THE MAIL FRAUD STATUTE.

Various counts in the indictment named specific persons as receiving or mailing different items used in the scheme. However, the actual evidence at trial disclosed a variance between indictment and proof since other members of the addressee's household either received the mail or mailed a reply card. The defense argues that the conviction on these counts should be reversed on the ground of fatal variance between indictment and proof.

■■ But the variances herein, usually amounting to a wife's opening the husband's mail or mailing his reply letter, are so insignificant that the result is a harmless inconsequential variance. To require a reversal, a variance between the indictment and the proof must affect the substantial rights of a defendant. As the Supreme Court observed in *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1932):

"The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense."

The mail fraud statute outlines three different uses of the mail in furtherance of a scheme to defraud which are prohibited: (1) the placing in any post office or authorized depository for mail matter, (2) the taking or receiving from any post office or authorized depository and (3) knowingly causing to be delivered by mail according to the direction thereon. The defendants were informed of the manner in which the mails were used to further the scheme to defraud and the basic description of the materials mailed. Their rights were not affected because a different member of the addressees' household actually received or opened the items sent through the mails. *United States v. Atchinson,* 524 F.2d 367 (7th Cir. 1975); *United States v. Cobb,* 397 F.2d 416 (7th Cir. 1968); *United States v. Moser,* 509 F.2d 1089 (7th Cir. 1975); *Cromer v. United States,* 78 U.S.App.D.C. 400, 142 F.2d 697 (1944).

Defendant Serlin cites *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) in support of his argument that a fatal variance between proof and the charges in the indictment was established at trial. But in *Stirone* it was clear that the prosecution relied at trial on facts much different than those which were enumerated in the indictment. That is not the situa-

tion present in this case where the indictment sufficiently apprised the defendants of the mailings but mistakenly named the persons who actually received the mailings.

The defendants also contend that counts nine through fifteen do not allege mailings in furtherance of the scheme to defraud. They cite *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and *United States v. Staszcuk,* 502 F.2d 875 (1974), for the proposition that "use of the mails that is not a step toward receipt of the fruits of the scheme is not covered by [the mail fraud statute] . . ." *Staszcuk,* 502 F.2d at 880.

These counts allege that the defendants caused to be delivered by mail to MLC various mail payment books, from which slips were removed and sent to MLC with each monthly payment. Because these mailings did not further the scheme, and because they principally dealt with defendants who were acquitted, the defense asserts that convictions on these counts were improper.

But our review of the record discloses that the government was justified in prosecuting these counts even after the dismissal of the MLC defendants. The mail payment books were essential in making the fraud possible. They gave the entire scheme a form of legitimacy or business propriety which inhibited the discovery of the real facts at an early stage. These mailings contributed substantially to the success of the entire scheme.[7] *United States v. Chason,* 451 F.2d 301, 303 (2d Cir. 1971); *Adams v. United States,* 312 F.2d 137, 140 (5th Cir. 1963).

The defendants' last technical attack on the indictment is that the counts alleging that the defendants caused to be mailed certain items were improper. Nei-

7. In fact the Cardet purchasers were held to the exact terms of the loans, even though fraudulent methods were used. The purchasers had to continue their monthly loan payments despite a total failure on the part of Cardet to live up to its promises or even deliver the basic merchandise. A civil suit has been filed seeking damages arising out of the loan agreements and is currently pending before Judge Marshall in the District Court for the Northern District of Illinois.

ther the case law nor the evidence presented supports the defendants on this point. The Supreme Court addressed this question in *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954), stating:

> "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."

The record shows use of business reply cards, which were pre-addressed and postage paid, and loan payment books. Thus it was reasonably foreseeable that the mails would be used in the ordinary course of business.

## IV. THE SINGLE SCHEME ALLEGED IN THE INDICTMENT WAS ESTABLISHED AT TRIAL.

■ Relying on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), defendant Phillips claims that the government's evidence did not establish a single scheme but, rather, established two separate schemes to defraud by Cardet and MLC thus creating a fatal variance requiring reversal. In *Kotteakos,* thirty-two persons were indicted for a single conspiracy to induce various financial institutions to make loans which would then be insured by the Federal Housing Administration. The loans were solicited on the basis of fraudulent information. Nineteen persons went to trial, and seven were convicted. The government was forced to admit that the evidence proved eight or more conspiracies by different groups of conspirators, which had little or no connection with each other. Contrasting those facts with the record in this case, it becomes clear that *Kotteakos* has no real application. Here there were direct connections between the MLC defendants and the Cardet defendants. During the meetings where the franchise and loan transactions were finalized both Cardet and MLC defendants made misrepresentations. In addition the overall scheme required cooperation from both sets of defendants even though the various defendants had different objectives.

■ The defendant Phillips also challenges the indictment presented in this case on another ground, i. e., that the indictment failed to apprise him of the crime with which he was charged. This Court has previously noted the requirements for a proper indictment in *Collins v. Markley,* 346 F.2d 230, 232 (7th Cir. 1965), where Judge Duffy stated in an *en banc* decision:

> "The sufficiency of an indictment is to be measured by certain guide lines. First, the indictment standing alone must contain the elements of the offense intended to be charged, and it must be sufficient to apprise the accused of the nature of the offense. Second, after conviction, the record of the case must be sufficient so that the accused can plead the judgment in bar of any subsequent prosecution for the same offense."

Here the indictment alleged the scheme and the misrepresentations, the victims of the scheme, the manner in which the mail was used and a description of the matter mailed. The judgment against Phillips would bar a subsequent prosecution for the offense alleged in the present indictment. Clearly, the indictment apprised Phillips of the offense with which he was charged, and the fact that a group of defendants was acquitted on the charge is not material to the issue of the indictment's sufficiency.

## V. THE COLLATERAL ESTOPPEL DOCTRINE DOES NOT BAR THE DEFENDANT SERLIN'S CONVICTION.

Defendant Serlin has presented an argument that his conviction is barred under collateral estoppel principles. He relies primarily upon the Supreme Court decisions in *Ashe v. Swensen,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). However, the facts in this case indicate that this is not a situation where the doctrine of collateral estoppel is applicable.

At trial Cyril Green was acquitted after testifying that in making sales presentations to prospective buyers he only represented what was contained in Cardet's promotional materials. He claimed he did not know that these representations were false. Serlin asserts that since Green was acquitted, the jury must have believed his testimony that he made no intentional misrepresentations. Thus Serlin concludes that his conviction, insofar as it rests upon evidence of transactions with Green, is collaterally estopped.

■ Collateral estoppel establishes what effect a determination of an issue in one suit will have on an issue in a later suit.

■ *Ashe* stands for the principle that an issue of ultimate fact, once having been decided by a valid and final judgment before a court of proper jurisdiction, cannot be relitigated by a party to that lawsuit in a subsequent proceeding.

■ In this case Serlin attempts to assert the jury's specific finding of not guilty as to Green as a bar to his conviction in the same prosecution. That constitutes a rather novel and tortured approach to the principle of collateral estoppel. Inconsistent verdicts on an issue in a single trial and relitigation of the issue in a subsequent trial are not identical questions. *United States v. Greene*, 497 F.2d 1068 (7th Cir. 1974). It is only in the latter situation that collateral estoppel becomes an issue.

■ At best, both defendants present an argument that the jury returned inconsistent verdicts. Such verdicts are permissible. *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Greene, supra; United States v. Tankersley*, 492 F.2d 962 (7th Cir. 1974); *United States v. Hickey*, 360 F.2d 127 (7th Cir. 1966); *United States v. DeLucia*, 262 F.2d 610 (7th Cir. 1958). Inconsistent verdicts are sometimes returned, not because the jury is making an ultimate finding of fact, but because juries act out of compassion and compromise in addition to logical reasoning.

## VI. THE TRIAL COURT DID NOT ERR IN ITS EVIDENTIARY RULINGS OR IN GIVING ITS INSTRUCTIONS TO THE JURY.

As we have stated previously, no error was committed by admitting evidence concerning the MLC defendants and their actions. Even if the government had only indicted Serlin and Phillips, the challenged evidence would still be admissible since it was relevant to prove the scheme to defraud which continued beyond Cardet's initial sales presentation.

In addition to the MLC evidence, Serlin also objects to the testimony of Allen Stein, a purchaser of a Cardet franchise prior to July 1971, on the ground that the events about which he testified were prior in time to the scheme alleged in the indictment. Admittedly much of the Stein testimony concerned events which occurred before July 1971, dealing with Stein's involvement with Cardet. However, this preliminary testimony was necessary to prepare the court and jury for Stein's very damaging testimony that he acted as a "set-up man" for Serlin in luring new customers.

■ Under 404(b) of the Federal Rules of Evidence, testimony of prior similar acts is admissible if relevant to an issue in the case. The relevancy of Stein's testimony was to establish Serlin's intent and motive in the scheme to defraud. Stein's testimony that Serlin asked him to cooperate in the scheme was crucial to counter the defense argument that Serlin was operating a legitimate business as president of Cardet. Trial judges have always been given broad discretion in balancing the probative value of the offered evidence against its potential prejudicial effect. *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974); *United States v. Gaus*, 471 F.2d 495 (7th Cir. 1973). In this case there is no indication that the trial judge abused that discretion.

■ The testimony of a number of witnesses has also been challenged because of their inability to identify the defendants in court. A witness' failure to identify a defendant does not automatically bar his testimony. Although in this case there

were numerous misidentifications, the record shows a number of positive identifications and sufficient evidence to support a finding of guilt. In this situation other Circuits have held that the testimony of the witness who cannot positively identify the defendant may still be sufficient and reliable when considered with all the other evidence. *United States v. Scarpellino,* 431 F.2d 475, 477 (8th Cir. 1970); *United States v. Kelley,* 334 F.Supp. 435, 436 (S.D.N.Y. 1971), *aff'd* 471 F.2d 647 (2d Cir. 1973); *Smith v. United States,* 358 F.2d 695 (5th Cir. 1966); *Roberts v. United States,* 109 U.S.App.D.C. 75, 284 F.2d 209 (1961). Judge Gibson succinctly summarized this issue in *Scarpellino*:

> "The fact that other witnesses were unable to make positive identifications of defendant does not 'present any question of infirmity or discredit in the identification testimony arguably as a matter of law.' *United States v. Stewart,* 429 F.2d 15 (8th Cir. 1970). Their inability to make positive identifications presents nothing more than a matter for factual argument to the jury. . . ." (431 F.2d at 477).

■ During closing argument, counsel for Phillips objected to the government's contention that Phillips was present in Cardet's office during the month of November 1972. The statement was intended to show that Phillips was not an innocent and unknowing participant in the fraud. Prior to the argument the government had stipulated that Phillips was Cardet's sales representative only until August 10, 1972. Yet there was evidence presented at trial, despite the stipulation, that Phillips was present at Cardet's offices in November of 1972. The stipulation and the testimony could be interpreted as merely complementing each other as opposed to contradicting each other. But we believe no error was committed since government counsel stated himself: "If you don't remember [the witness] saying Mr. Phillips returned, disregard it. If you do remember it, please remember it." Closing argument of counsel should be based on the evidence. However, counsel are not prevented from arguing inferences or discrepancies presented by the evidence. In this case we believe the argument was justified.

■ Defendant Serlin has claimed certain errors in the trial judge's instructions to the jury. One instruction described a false or fraudulent representation as one based upon a "reckless indifference" standard.[8] We do not perceive that the giving of this instruction was improper since the jury was told repeatedly in other instructions that it must find a specific intent to defraud before a verdict of guilt could be returned.

■ Serlin also challenges the instruction which required that "the government prove beyond a reasonable doubt one or more of a sufficient number of false or fraudulent representations that the scheme to defraud was actually set up." The government has responded to Serlin's argument that the instruction given was required under our previous decision in *United States v. Joyce,* 499 F.2d 9, 22–23 (7th Cir. 1974). The government is correct in its assertion, and Serlin's claim is without merit.

8. The instruction reads:

"The Court instructs the jury that mere suspicion is not sufficient to prove participation in an alleged scheme to defraud.

A statement or representation is 'false or fraudulent' within the meaning of this statute, if known to be untrue, or made with reckless indifference as to its truth or falsity, and made or caused to be made with the intent to deceive.

A 'false or fraudulent representation' may be made by statements of half truths or the concealment of material facts, as well as by affirmative statements or acts and made or caused to be made with the intent to deceive.

The crime of mail fraud charged in this case requires proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to deceive and defraud. Such intent may be determined from all the facts and circumstances surrounding the case."

## VII. THE TRIAL COURT PROPERLY DENIED SERLIN'S MOTION TO DISMISS THE INDICTMENT ON THE BASIS OF GOVERNMENT MISCONDUCT.

Finally, defendant Serlin has persisted in his argument on appeal that the indictment in this case should have been dismissed because of the pre-indictment conduct of the government investigators and attorneys which, in his words, presents "a rather tawdry story". Unfortunately for defendant Serlin, neither the trial court nor this Court of Appeals accepts his version that the pretrial proceedings were "tawdry".

What the record does present is a repeated attempt by Serlin to obtain for himself immunity from prosecution in exchange for assistance in investigating the Cardet and MLC scheme to defraud. It is true that the investigation was handled by different Assistants United States Attorneys before an indictment was returned. Yet there is no evidence that any prosecutor ever gave a promise of immunity to Serlin.[9] The trial judge looked closely into this matter and even took the precaution of suppressing statements which were allegedly made "off the record".

Serlin depicts himself as a "victim of veiled inducements and half promises [made] to encourage him to abandon his Fifth Amendment privilege and to help the government convict him." But this characterization finds support exclusively in Serlin's testimony. On the other hand the record reveals that the government made repeated warnings to Serlin that only the possibility of immunity existed. At the meetings between Serlin, his counsel, and the government attorneys and investigators, a waiver of rights form was executed. It is noteworthy that, at the first of these meetings, the waiver of rights form was executed by Serlin only after his careful reading of the form and a conference with his attorney.

A dismissal on the ground of government misconduct is justified only in situations where, due to government action, the defendant cannot receive a fair trial and therefore is deprived of due process of law. *United States v. McCord*, 166 U.S. App.D.C. 1, 509 F.2d 334, 348 (1974); *United States v. Heath*, 260 F.2d 623 (9th Cir. 1958); *United States v. Banks*, 383 F.Supp. 389, 391 (W.D.S.Dak.1974). Clearly, in this case, the actions of the government cannot be classified as misconduct. The initial contact in the preindictment negotiations was made by Serlin's attorney with his client's approval. Serlin's own attorney admitted that no promises of immunity were made. Additionally, the government declined to use any of Serlin's statements obtained at the meetings. A full examination of the record indicates that Serlin received a fair trial and was afforded due process of law.

Accordingly, the convictions of defendants Serlin and Phillips are affirmed.

AFFIRMED.

9. Judge Marovitz specifically found that:
"In this case, according to the undisputed testimony, these conversations were initiated by the defendant Serlin and his then attorney Mr. Freeman. They are the ones that went to the U.S. Attorney's office to see what bargain they could strike and at no time, according to Mr. Freeman, who was his initial attorney, were there any commitments made. There were many indications made, apparently from this record, by several staff members, the U.S. Attorney's staff, that they were satisfied he was telling the truth and could cooperate. The most they said they would do would be to call that to the Court's attention and stand mute at the time of the disposition of the case and that would depend upon the defendant's cooperation and his telling the truth. Apparently along the line they came to the conclusion that he wasn't telling the truth."