ADOLPH SCHWARZ and CAROL SCHWARZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SHELDON SERLIN and MARSHA SERLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwarz v. Commissioner
Docket Nos. 6036-76, 11509-77.
United States Tax Court
T.C. Memo 1981-94; 1981 Tax Ct. Memo LEXIS 650; 41 T.C.M. (CCH) 1002; T.C.M. (RIA) 81094; February 26, 1981. William F. Marutzky, for petitioners Adolph and Carol Schwarz. Sheldon Serlin, pro se. Lawrence I. Serlin, for petitioner Marsha Serlin. William E. Bogner, for respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent *651 determined deficiencies in petitioners' Federal income taxes and additions to tax for 1972 as follows: Addition to tax
Addition to tax
Petitioner
Deficiency
under section 6651(a)
under section 6653(a)
Adolph and Carol
Schwarz
$ 4,648.20
$ 232.40
Sheldon and Marsha
Serlin
$ 78,811.68
$ 3,945.78
$ 4,033.78
The issues for decision are 1) whether petitioners received unreported income during 1972; 2) whether Adolph and Carol Schwarz are entitled to various business deductions; 3) whether Marsha Serlin qualifies as an innocent spouse under the provisions of section 6013(e); [1] and 4) whether petitioners are liable for the additions to tax under sections 6651(a) and 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated by this reference. Petitioners Adolph Schwarz ("Schwarz") and Carol Schwarz resided in Hometown, Illinois, at the time their petition was filed in this case. Petitioners Sheldon *652 Serlin ("Serlin") and Marsha Serlin resided in Northbrook, Illinois, at the time their petition herein was filed. Serlin started a business called Cardet as a sole proprietorship in 1968. He incorporated the business under the name of Cardet International, Inc. ("Cardet") in 1969. Serlin was president and chairman of the board of directors of Cardet from its inception and at all times relevant to this case. Serlin was the sole shareholder of Cardet at first. Subsequently, other persons owned small amounts of Cardet stock. Cardet originally was a mail order business for household and consumer products. Then, Cardet began selling distributorships or franchises. During 1972, the year in issue, Cardet's income mainly consisted of receipts from the sale of these franchises. Many persons were induced to buy franchises from Cardet through mailing and newspaper advertisements. Cardet entered into an agreement with a corporation known as Talent Network in 1971 under which Dick Butkus (a former football player for the Chicago Bears) provided an endorsement for Cardet's advertising. The ads described Cardet's business of selling top quality consumer products and appliances, and *653 emphasized the great financial potential of Cardet franchises. Cardet sold franchises to buyers for $ 5,000 per franchise. Each franchise purportedly entitled the buyer or franchisee to the exclusive right to solicit orders for household and other consumer products in geographical sales territories comprising approximately 2,500 homes. Each month the franchisee would distribute brochures outlining selections of Cardet products to residents of the franchise area who could then order the Cardet products from their own homes. For every order placed in the franchisee's area a commission would be paid. When a prospective buyer showed an interest in purchasing a franchise, he either went to a Cardet office or a Cardet representative appeared at his home. At that point, various representations were made by the Cardet representatives to the prospective buyers concerning the business operations. In order to finance the purchase of these franchises, Cardet, through its representatives, had arranged for the buyers to obtain loans from Mercantile Loan Corporation ("MLC"). After an agreement on the sale of a franchise was reached, the buyer would borrow $ 5,000 from MLC and endorse over *654 the loan proceeds checks to Cardet as payment for their franchise. The loans were collateralized by the residences of the buyers with MLC taking mortgages on the residences. Because of the deceptive manner in which the buyers were induced to sign the franchise agreement, loan agreement and related documents, the buyers often were not aware that they were granting MLC a security interest in their residences. Misrepresentations were also made about the rate of interest, the amount of prepayment penalties and the time in which the loan would be repaid. Cardet received a finder's fee from MLC for each loan Cardet arranged. Schwarz sent a resume to Cardet in November, 1971, in response to an advertisement. Since Schwarz did not have enough money to purchase a distributorship, Serlin hired him as an employee of Cardet and agreed to pay him $ 350 per week. At first Schwarz attempted to sell distributorships but was unsuccessful. Thereafter, Schwarz's duties consisted of working in the office, collecting reports from other Cardet salesmen, ensuring that the mail was sent, general janitorial work and some sales work. Cardet took in thousands of dollars in 1972 from the sale of franchises. *655 However, the franchisees failed because Cardet's business was a fraudulent scheme used by Serlin, Schwarz and others to defraud the purchasers. Cardet's business did not involve the mail order marketing and sale of consumer goods, but rather the fraudulent sale of franchises themselves. On September 5, 1974, an indictment was filed in the United States District Court for the Northern District of Illinois against Serlin and Schwarz and others. It set forth numerous allegations against Serlin and Schwarz and named each with having committed acts constituting 15 counts of mail fraud in violation of 18 U.S.C. 1341. Indicia of the fraud perpetrated upon the franchise buyers by Serlin, Schwarz and others associated with Cardet included various misrepresentations made to the franchise purchasers: that Cardet was an established national enterprise in the mail order business with offices in major cities like Atlanta, Chicago, Dallas, Houston, Los Angeles and Philadelphia; that Cardet had a nation-wide network of successful distributors and area managers; that a nation-wide network of Cardet warehouse facilities existed; that Cardet had annual sales in excess of *656 a million dollars; that Cardet was spending large amounts of money in the development of successful marketing techniques; that Cardet provided an extensive training program; that Cardet provided franchisees with catalogues listing hundreds of items available including cosmetics, appliances, cars and yachts; that Cardet could sell its products, obtained directly from manufacturers, at a 50 percent discount; that Cardet franchisees generated large amounts of profits; that the only collateral necessary for financing was the franchise itself; that franchisees were able to repay loans within a year of purchase; and that Cardet would buy back a franchise for at least $ 5,000 at any time. Serlin and Schwarz were each found guilty by a jury on all 15 counts of mail fraud. Serlin's conviction was affirmed on appeal. United States v. Serlin,538 F.2d 737 (7th Cir. 1976). After Cardet started selling franchises, it took in large quantities of money. At some time between 1970 and 1972, Serlin signed leases on behalf of Cardet for approximately four Lincoln Continental Mark IV automobiles. These cars were used by Serlin, his wife, Schwarz and other salesmen employed by *657 Cardet. The cars were often used to drive prospective franchisees from Cardet's offices to MLC's offices to sign loan agreements. During April and May, 1972, Serlin gave $ 16,000 to Schwarz to hold for Serlin. A large portion of this money was given to Schwarz in cash. The two agreed that the money belonged to Serlin and was to be held by Schwarz until Serlin requested its return. Serlin entrusted the money to Schwarz in order to keep it from his wife, Marsha Serlin, with whom he was experiencing marital problems. Schwarz and his wife, Carol, purchased ten certificates of deposit with the money he received from Serlin at First Federal Savings and Loan Association of Des Plaines, Illinois ("First Federal"). Seven certificates of deposit totaling $ 13,000 were in Adolph Schwarz's name, and three certificates of deposit totaling $ 3,000 were in Carol Schwarz's name. On August 25, 1972, Serlin requested repayment of the money previously entrusted to Schwarz. On September 5, 1972, Schwarz cancelled the seven certificates of deposit in his name at First Federal. The bank issued him a check for $ 13,113.32 which he endorsed and cashed the same day. On or soon after September 5, 1972, Schwarz *658 turned over this cash to Serlin as requested. On September 18, 1972, Carol Schwarz cancelled the three certificates of deposit in her name at First Federal. The bank issued her a check for $ 3,005.55. She endorsed the check and gave it to Schwarz who gave it to Serlin. Serlin then endorsed the check and cashed it at the First National Bank of Lincolnwood, Illinois. Cardet had a checking account at the First National Bank of Lincolnwood. Serlin opened the account on June 29, 1970, and listed himself as chairman of the board of Cardet. He was the only person authorized to sign checks on Cardet's account, and all checks ever written on the account were signed by Serlin. At all times material herein, Serlin maintained Cardet's records. Schwarz had no control over the corporate checkbook or any other corporate records. During 1972, Serlin signed 139 checks on Cardet's checking account at the First National Bank of Lincolnwood, the proceeds of which totaled $ 179,578.52 and which are in issue in the case at bar. These 139 Cardet checks in issue were payable and last endorsed as follows: (1) 47 checks totaling $ 48,030.10 were payable to the Serlins, 46 of these were payable *659 to Marsha Serlin and endorsed by her and one was payable to Sheldon Serlin and endorsed by him; (2) 64 checks totaling $ 116,061.97 were payable to cash. Sheldon Serlin endorsed all of these checks; (3) 4 checks totaling $ 2,875.00 were payable to third parties other than Sheldon or Marsha Serlin or Adolph or Carol Schwarz. Each of these four checks was last endorsed by Sheldon Serlin; (4) 24 checks totaling $ 12,611.45 were payable to the Schwarz's, 15 of these were payable to Adolph Schwarz and nine were payable to Carol Schwarz. Of these 24 checks, five checks totaling $ 5,425.50 were last endorsed by Sheldon Serlin; seven checks totaling $ 5,550.35 were last endorsed by Adolph or Carol Schwarz or were deposited in their accounts; and two checks totaling $ 1,635.60 are unavailable, as is the name of the endorser or the account into which they were deposited. Sheldon and Marsha Serlin received the following amount of taxable income from Cardet during 1972: Description of Checks
Total Amount
1) Checks payable to Sheldon
or Marsha Serlin
$ 48,030.10
2) Checks payable to cash;
endorsed by Serlin
116,061.97
3) Checks payable to Adolph
or Carol Schwarz and last
endorsed by Serlin
5,425.50
4) Checks payable to other
persons; last endorsed
by Serlin
2,875.00
TOTAL
$ 172,392.57
*660 Adolph and Carol Schwarz received the following amount of taxable income from Cardet during 1972: Description of Checks
Total Amount
1) Checks payable to Adolph
or Carol Schwarz
$ 12,611.45
2) Less: Checks payable to
Adolph or Carol Schwarz
but last endorsed by
Sheldon Serlin
5,425.50
TOTAL
$ 7,185.95
During 1972, MLC issued 19 checks which were jointly payable to Schwarz and Serlin as finders's fees for each MLC loan made to a Cardet franchisee. These 19 MLC checks totaled $ 6,400.00; 17 of these checks were last endorsed by Adolph or Carol Schwarz; two of these checks were last endorsed by Serlin. Schwarz and Serlin had previously agreed to divide the proceeds of these 19 MLC checks equally and each received $ 3,200.00. During 1972, Sheldon and Marsha Serlin maintained 13 accounts at various banks and savings and loan institutions. They made deposits totaling $ 119,698.46 into these various accounts during 1972, as follows: 1) Nine deposits totaling $ 15,050.00 were made by Marsha Serlin into her individual savings account at First Federal Savings and Loan Association of Chicago. 2) Five deposits totaling $ 79.93 were made into a savings account *661 which Sheldon and Marsha Serlin maintained as trustees for the benefit of Bradley Serlin, their son, at the First Federal Savings and Loan Association of Chicago. 3) Three deposits totaling $ 62.16 were made into a savings account Marsha Serlin maintained as trustee for the benefit of Cindy Serlin, her daughter, at First Federal Savings and Loan Association of Chicago. 4) One deposit in the amount of $ 10,000.00 was made by Marsha Serlin into her individual savings account at First National Bank of Lincolnwood. 5) One deposit in the amount of $ 11,544.60 was made by Marsha Serlin into a savings account she maintained as trustee for the benefit of Bradley Serlin at the First National Bank of Lincolnwood. 6) Three deposits totaling $ 16,500.00 were made by Marsha Serlin into a savings account she maintained as trustee for the benefit of Cindy Serlin at the First National Bank of Lincolnwood. 7) 25 deposits totaling $ 26,845.35 were made by Marsha Serlin into her individual checking account at the Dempster Plaza State Bank. 8) One deposit in the amount of $ 15.00 was made into Sheldon and Marsha Serlin's joint checking account at the Northern Trust Company. 9) Nine *662 deposits totaling $ 12,500.00 were made by Marsha Serlin into her account at Northern Trust Company. 10) Three deposits totaling $ 9,000.00 were made by Marsha Serlin into her individual savings account at Park Ridge Federal Savings and Loan Association. 11) Six deposits totaling $ 13,800.00 were made by Marsha Serlin into her individual checking account at First National Bank of Northbrook. 12) One deposit in the amount of $ 250.00 was made by Marsha Serlin into a savings account she maintained as trustee for the benefit of Cindy Serlin at the First National Bank of Northbrook. 13) One deposit in the amount of $ 4,051.42 was made by Marsha Serlin into a savings account she maintained as trustees for the benefit of Bradley Serlin at the First National Bank of Northbrook. During 1972, Sheldon and Marsha Serlin received interest from the accounts they maintained, jointly and individually, in the total amount of $ 338.23 which amount they did not report on their 1972 income tax return. During late September, 1972, Sheldon and Marsha Serlin purchased a residence in Northbrook, Illinois. The cost of the house was $ 84,000.00. They paid $ 42,000.00 in cash and financed *663 the other half of the purchase price with a loan obtained from the First National Bank of Lincolnwood in the amount of $ 42,000.00. The record owner of the Serlin's residence in Northbrook was an Illinois Land Trust, No. 20342, created by a trust agreement dated September 11, 1972 at the Cosmopolitan National Bank of Chicago. The sole beneficiary of the Land Trust was Marsha Serlin. Marsha Serlin moved into the Northbrook residence in September, 1972. Prior to September, 1972, she and her husband had rented a home in Des Plains, Illinois. On November 24, 1972, Sheldon and Marsha Serlin refinanced their purchase of their residence through Fireside Federal Savings and Loan Association ("Fireside"). They took out a loan of $ 66,000.00 from Fireside which was secured by a second mortgage on their Northbrook residence. A portion of the proceeds from this loan were used to pay off the mortgage held by First National Bank of Lincolnwood and other fees and expenses attendant to the loan. The balance of the loan proceeds in the amount of $ 21,851.42 was paid to Marsha Serlin and was used to pay off family bills and debts. An appraisal review prepared by Fireside on November 1, 1972 described *664 the Serlin's residence as "a luxury type home located in an area of homes ranging in value from $ 60,000 to $ 90,000." The house is a two-story colonial style, four bedroom brick house with a two car garage, two natural fireplaces and a U-shaped driveway. Following a foreclosure in 1974, Marsha Serlin entered into a purchase contract under which she began making payments toward the purchase of the Northbrook residence. She was still living in this house at the time of her testimony in this case on February 1, 1980. She and her husband were divorced in late 1979. Mrsha Serlin was not employed and had no earned income during 1972. However, during that year, she hired a woman to clean her house and saw a psychiatrist once or twice a week. She and her children took a five-day vacation to California during 1972. She had use of one of the Lincoln Continental Mark IV automobiles rented by Cardet during the year in issue. During 1972 Adolph and Carol Schwarz made deposits to their accounts at the First Federal Savings and Loan Association of Des Plaines and at the First National Bank of Des Plaines in the amount of $ 29,390.06, which amount includes the $ 16,000 given to Schwarz *665 by Serlin to hold for Serlin pending the resolution of Serlin's marital problems. Their deposits total $ 13,390.06 when Serlin's $ 16,000 is subtracted. Although Schwarz received some salary payments from Cardet, he was not fully compensated for his work. By October, 1972, Cardet owed Schwarz almost $ 10,000.00 in unpaid salary based on the $ 350 per week salary agreement. On October 11, 1972, Schwarz wrote a letter to Serlin in which he resigned from Cardet effective October 12, 1972. Schwarz stated in the letter that Serlin owed him almost $ 10,000.00 in back pay and that he was without other funds. Schwarz also agreed to return the Lincoln automobile that he had been using. ULTIMATE FINDINGS OF FACT
Petitioners, Sheldon and Marsha Serlin, received the following amounts of income during the year in issue which were not reported on their income tax return: Description
Amount
Cardet Income
$ 172,392.57
MLC Income
3,200.00
Interest Income
338.23
$ 175,930.80
Less: Amount Reported
On Return
15,730.10
Unreported Income
$ 160,200.70
Petitioners, Adolph and Carol Schwarz, received the following amounts of income which were not reported on *666 their income tax return: Description
Amount
Cardet Income
$ 7,185.95
MLC Income
3,200.00
$ 10,385.95
Less: Amount Reported
On Return
7,519.85
Unreported Income
$ 2,866.10
OPINION
Petitioners, Sheldon Serlin and Adolph Schwarz, were intimately involved in the financial affairs of Cardet International, Inc., during 1972, the year in issue in this case. Cardet was founded by Sheldon Serlin who was also its president and chairman of the board of directors. It was originally a mail order business for household and consumer goods. Cardet, in late 1971 and 1972, sold distributorships or franchises to a number of people at a cost of $ 5,000 per franchise. Cardet was very successful in taking in large amounts of money in 1972. However, it became apparent that Cardet was a fraudulent operation which was selling essentially worthless franchises by propounding numerous misrepresentations to prospective franchise purchasers. Sheldon Serlin and Adolph Schwarz and others were indicted on September 5, 1974, and charged with committing acts constituting 15 counts of mail fraud in violation of 18 U.S.C. 1341. They were tried to a jury *667 in the United States District Court for the Northern District of Illinois and were found guilty on all 15 counts of mail fraud. Serlin's conviction was affirmed on appeal. United States v. Serlin,538 F.2d 737 (7th Cir. 1976). Schwarz apparently did not appeal his conviction. The central issue in these cases involves the determination of what portion of $ 179,578.52 represented by 139 checks written on Cardet's bank account was received by Serlin and what portion was received by Schwarz. A related issue concerns the ultimate receipt of $ 6,400.00 represented by 19 checks from MLC which were jointly payable to Serlin and Schwarz. As to petitioners Adolph and Carol Schwarz, respondent reconstructed their income for 1972 by proof of bank deposits and specific items of income evidenced by cancelled checks and check stubs. When respondent reconstructs a taxpayer's income his determination is deemed correct unless the method used is arbitrary. The burden of proof, normally, is on petitioner to show that respondent's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933). However, petitioners Adolph and Carol Schwarz contend that *668 respondent has the burden of proof as to their alleged deficiency because he increased the amount of the deficiency and changed the grounds upon which he based the deficiency in an amended answer. The amount of the deficiency originally asserted against Adolph and Carol Schwarz in their notice of deficiency was $ 4,648.20 for 1972. This deficiency was based on their alleged receipt of $ 19,905.93 of unreported income. The explanation of the adjustments in the notice of deficiency stated that their gross receipts had been reconstructed by reference to bank deposits. In an amended answer, the respondent increased their deficiency to $ 74,170.71, based on their alleged receipt of $ 162,428.48 of unreported income. This increased deficiency was based on specific items of income such as checks that were received from Cardet. In a hearing on respondent's motion to amend his answer, respondent argued that since each couple of petitioners accused the other with ultimate receipt of the income in issue, it was necessary that the full amount of the items in dispute be asserted against each couple to prevent respondent from being whipsawed into a result unfavorable to respondent.Furthermore, *669 respondent argued that in order to avoid this whipswing effect, the Adolph and Carol Schwarz case would be converted into a specific items case rather than a bank deposits case. Respondent later abandoned the increased deficiency asserted against Adolph and Carol Schwarz. On brief, respondent requested as an ultimate finding of fact that the Schwarz's deficiency in income tax be based on their receipt of $ 2,866.10 of unreported income, which is less than the amount originally asserted in the notice of deficiency. However, respondent used both the bank deposits and specific items of income methods to reconstruct their income for 1972. Where respondent increases a deficiency in his answer, the burden of proof is on respondent only as to the increased amount of the deficiency. Beck Chemical Equipment Corporation v. Commissioner,27 T.C. 840 (1957); Rule 142, Tax Court Rules of Practice and Procedure. He abandoned the increased deficiency so the burden of proof did not shift to respondent in this regard. But where, as here, respondent departs from the grounds upon which he based his original determination of deficiency, and in an amended answer relies upon other *670 grounds to support the deficiency, he assumes the burden of proof with respect to the new grounds for his claim. Rule 142, Tax Court Rules of Practice and Procedure; see Papineau v. Commissioner,28 T.C. 54 (1957). Here respondent changed his method of reconstructing Adolph and Carol Schwarz's income from the bank deposits method to the specific items of income method and so he has the burden of proving their unreported income based on specific items. Nevertheless, we are satisfied that respondent has sustained his burden of proof. First, respondent produced documentary evidence to show that Adolph and Carol Schwarz made deposits in 1972 of $ 13,390.06 of taxable income into their two bank accounts. Second, respondent produced evidence to show that they received $ 7,185.95 of taxable income from Cardet, based on 19 checks made payable to Adolph or Carol Schwarz which were either endorsed by them of deposited into their accounts.Also, Adolph Schwarz admitted that he received one half of the proceeds from the MLC checks, or $ 3,200.00. Petitioners Adolph and Carol Schwarz have failed to come forward with convincing evidence to rebut respondent's proof. Therefore, *671 we hold that they received unreported taxable income in the amount of $ 2,866.10 in 1972. Respondent disallowed petitioners Adolph and Carol Schwarz's business expense deductions totaling $ 1,850.82 because they were not substantiated.Petitioners have failed to sustain their burden of proof with respect to these deductions, Welch v. Helvering,290 U.S. 111 (1933), and so we uphold respondent's disallowance of these items. As to petitioners Sheldon and Marsha Serlin, respondent reconstructed their income for 1972 by proof of specific items of income evidenced by cancelled checks, check stubs and bank deposits. Respondent determined that they received $ 172,392.57 of taxable income from Cardet represented by a number of checks written on Cardet's bank account, all of which were last endorsed by Sheldon or Marsha Serlin. Respondent also determined that they received $ 3,200.00 of taxable income from MLC, and $ 338.23 of interest income on their various bank accounts. After he subtracted the income reported on the Serlin's return, respondent asserted that they received $ 160,200.70 of unreported taxable income in 1972. The burden of proof is on petitioners to *672 show that respondent's determination is incorrect. Welch v. Helvering,supra. Petitioner Sheldon Serlin contends that Adolph Schwarz paid him $ 7,500.00 with Cardet checks for his (Serlin's) interest in Cardet in January, 1972. Serlin, however, has failed to produce convincing evidence to establish that Schwarz ever purchased an interest in Cardet from Serlin.The overwhelming weight of the evidence indicates that Serlin was in control of Cardet at all times during 1972 and that Schwarz never had authority to direct payments from Cardet to Serlin or anyone else. In fact, all of Cardet's checks were signed by Serlin, who was the president of Cardet and the only person authorized to sign such checks. Serlin also contends that $ 25,000.00 he received from Cardet constituted repayment of loans he made to Cardet. Again, he has failed to produce convincing evidence to support this contention. There is no sufficient documentary evidence of these alleged loans and Cardet's books did not reflect any loans from shareholders. Although Serlin admits that he and his wife received the proceeds of the Cardet check made payable to them, he denies ever receiving the proceeds *673 from the Cardet checks made out to cash. However, the evidence clearly indicates that he and his wife did receive such proceeds.All of these checks to cash were last endorsed by Serlin. Further-more, he and his wife made deposits during 1972 into their various bank accounts totaling $ 129,698.46. Petitioners Sheldon and Marsha Serlin have failed to satisfy their burden of proving respondent's determination to be incorrect. We hold that they received taxable income in the amount of $ 160,200.70 in 1972. Petitioner Marsha Serlin contends that she qualifies as an innocent spouse under the provisions of section 6013(e). Under that section a spouse is considered to be innocent of wrongly omitting income even though she joined in the filing of a return under section 6013(a) if three prerequisites are met: 1) the income found to be omitted is attributable to the other spouse and exceeds 25 percent of the gross income stated in the return; 2) the spouse did not know, and had no reason to know, of the omission; and 3) after considering all facts and circumstances and whether the spouse derived a significant benefit from the omitted income it is inequitable to hold the spouse liable for *674 the deficiency arising due to the omission. Marsha Serlin joined in the filing of the return for the year in issue. At trial she testified that when she signed the return she was concerned because she did not think it was correct. Indeed her concern was not misplaced since she was knowledgeable of the status of the family finances. During 1972 she made deposits of Cardet checks totaling over $ 100,000.00 into her various bank accounts. She also significantly benefitted from the increased wealth. Her standard of living was in line with the increased income she and her husband received. They purchased a new home for $ 84,000.00 (with a $ 42,000.00 cash down payment), she had use of a Lincoln Continental Mark IV automobile and her family took expensive vacations. We find that Marsha Serlin fails to satisfy the conditions set forth in section 6013(e)(1)(B) and (C) and, therefore, fails to qualify as an innocent spouse. Sonnenborn v. Commissioner,57 T.C. 373 (1971). Finally, respondent asserted additions to tax against Adolph and Carol Schwarz under section 6653(a) and against Sheldon and Marsha Serlin under sections 6651(a) and 6653(a). Petitioners have *675 the burden of proving that respondent's imposition of these penalties is erroneous. Since they offered no such proof, we hold that they are liable for these additions to tax. To reflect the foregoing, Decisions will be entered under Rule 155 in docket Nos. 6036-76 and 11509-77. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise specifically indicated.↩