**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William ABRAHAM et al., Defendants-Appellants.**

Nos. 75–1828, 75–1829.

United States Court of Appeals, Seventh Circuit.

Argued April 30, 1976.

Decided Sept. 9, 1976.

Thomas H. Ramsey, Raymond J. Smith, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Anne Bowen Poulin, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, BAUER, Circuit Judge, and CAMPBELL, Senior District Judge.[*]

PER CURIAM.

Defendants-appellants William Abraham, Ronald Henkin and Francis M. Mulligan, together with four co-defendants, were tried by a jury on a one count indictment charging them with conspiracy to commit extortion, in violation of Title 18, United States Code, Section 1951.[1]

The indictment charged that, at various times from January 1964 to the date on which the indictment was filed, the defendants were members of the Chicago Police Department assigned to the vice squad of the 19th Police District. Further, the indictment charged that they wrongfully used their positions as Chicago Police Officers to obtain sums of money from named retail liquor dealers and their employees, inducing the consent of the liquor dealers under color of official right. It was also alleged that the money so obtained was distributed among the members of the police vice squad. Of the seven defendants, the jury convicted only Abraham, Henkin and Mulligan.[2] Judge McGarr sentenced Henkin to one year and Abraham and Mulligan each to eighteen months.

The government's evidence at trial centered around the evidence presented by a key witness, Joseph Thomas, an unindicted co-conspirator who testified pursuant to a grant of immunity. When Thomas, also a Chicago Policeman, joined the 19th District vice squad in February of 1964 he discovered that the vice squad was organized to collect monthly payments from "the club".

The payments constituted "the package", which would be divided among the vice officers at a monthly "sit-down". The club was composed of tavern owners and bookmakers located in the 19th District. The officers assigned to the night shift collected the "night package" primarily from the tavern owners. The other officers collected the "day package" from other sources. The officers would bring what money they collected to the sit-downs where the package was divided and current club membership discussed. Relief officers shared in the package, but did not attend the monthly meetings. The sit-downs were held at the beginning of the month in various locations.

Thomas' periods of duty with the 19th District vice squad overlapped those of Abraham, Henkin and Mulligan. During the periods of overlap, Thomas discussed the club with each defendant. Thomas' share of the package was $125 a month when he first joined the vice squad and eventually got as high as $500 a month. In addition to the regular monthly collection, there was an extra collection at Christmas.

Seventeen tavern owners testified that, as members of the club, they had made payments to members of the vice squad. They paid monthly, giving extra for Christmas and generally paying in cash from the tavern receipts. The club was originally organized by Gene Benjamin, who pleaded guilty before trial. Some club members paid only Benjamin. Four tavern owners, however, each testified that they paid mon-

---

[*] The Hon. William J. Campbell, United States District Court for the Northern District of Illinois, is sitting by designation.

1. Title 18 U.S.C. § 1951 states, *inter alia*:
   "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . . extortion . . . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

\* \* \* \* \* \*
   (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

2. The jury acquitted Donald G. Herman and failed to reach a verdict regarding Robert J. Herman, David W. McNee and Richard L. Weingart. The trial court subsequently granted McNee's motion for judgment of acquittal.

ey to, or discussed the club with, Henkin and Abraham. Six tavern owners testified that they paid money to, or discussed the club with, Mulligan. In return for their payments, the tavern owners avoided harassment and diligent law enforcement that could discourage business.

Various liquor distributors testified that they shipped, in interstate commerce, whiskey and beer to certain tavern owners who belonged to the club. They further testified that the beer and whiskey they sold was purchased by them from sources outside of Illinois. There was no testimony that any liquor was shipped in interstate commerce to these tavern owners during 1964 to 1966.

On appeal the defendants claim that their convictions should be reversed because the evidence presented showed a minimum of two separate conspiracies creating a fatal variance; that the trial court erred in his evidentiary rulings and instructions to the jury; and that the prosecutor's final argument was improper. We will consider each of these points separately.

## I. THE GOVERNMENT'S EVIDENCE PRESENTED AT TRIAL ESTABLISHED A SINGLE CONTINUOUS CONSPIRACY.

The details of the conspiracy were provided by former policeman Thomas. Because of his duty assignments he did not serve in the vice squad the entire eleven years covered by the indictment. But he did testify that during the two periods he was assigned to the vice squad he participated in the conspiracy with the defendants. From February 1964 through October 1965 Thomas worked with defendants Abraham and Henkin. In fact Abraham was Thomas' partner for six of those months. Thomas testified that during this time the defendants shared

in the proceeds of the extortion plot. In addition, various tavern owners testified that Abraham and Henkin received payoffs from them.

Abraham and Henkin both left the vice unit in mid-1966 and returned after Thomas left in late 1970. Defendant Mulligan joined the vice unit in early 1968 and was still a member when Thomas left. Thomas testified that at various times Mulligan also affirmatively participated in the conspiracy. Certain tavern owners also named Mulligan as a recipient of the payoffs.

■ The defense argues that, as a result of the various assignments of Thomas and the other defendant police officers, the government failed to prove a single continuous conspiracy. We disagree. The periods in which the defendants were not actively participating in the conspiracy, and the absence of a direct link between Mulligan and the other two defendants, does not create a fatal variance between the proof offered and the indictment. We see the evidence as establishing a single ongoing conspiracy in which various co-conspirators moved in and out of active participation. There is no evidence that the defendants ever took affirmative action to withdraw from the conspiracy. *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *United States v. Borelli,* 336 F.2d 376, 388–90 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).[3]

In nearly every conspiracy case the claim is made that a variance exists because multiple conspiracies were shown. This line of argument is based upon *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), in which thirty-two persons were indicted and the government admitted that eight or more conspiracies were present with little factual connection. But this case does not involve a factual situation

**3.** Defendants claim, as a matter of law, that at least Abraham and Henkin abandoned the conspiracy. We agree with the government's argument. Defendants misplace their reliance on *United States v. Goldberg,* 401 F.2d 644 (2d Cir.), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1968), in which the Court held that one conspirator had withdrawn as a mat-

ter of law and was entitled to acquittal under the statute of limitations. In *Goldberg,* the acquitted defendant had left permanently the position essential to his participation in the conspiracy. By contrast, the defendants in the instant case were only temporarily assigned out of the vice squad, and they returned to it while the conspiracy was still operating.

as was presented in *Kotteakos.* Rather, this case meets the test as described in *United States v. Varelli,* 407 F.2d 735 (7th Cir. 1969), in which this Court set forth one method to distinguish between a single conspiracy and multiple conspiracies. The Court stated:

"While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies.

The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy."

*Id.* at 742 (citation omitted).

The Court reversed the convictions in *Varelli* because it did not believe that there was "one overall agreement among the various parties. . . ." But in this case there was evidence showing one agreement to organize, maintain and collect monthly payments from a club of tavern owners. The Thomas testimony is not continuous due to the various district reassignments of Thomas and the other defendants. Nevertheless, the collections from the tavern owners did not stop while Thomas was absent from the vice squad during October 1965 through June 1966. Mr. Baukas, owner of the Beritz Theatre Lounge, testified that he made monthly payments to members of the vice squad from sometime in 1964 through late 1971 or early 1972. Nor did the conspiracy terminate when Thomas left the vice squad in November 1970. Various tavern owners testified that they continued to make payments to three defendants after Thomas left the vice squad.

The defense also argues that the refusal to instruct the jury on the question of multiple conspiracies was improper. *United States v. Varelli, supra,* and *United States v. Borelli, supra,* both hold that the trial judge should instruct the jury on multiple conspiracies when the possibility of a variance appears. The record discloses that the trial judge discussed the proposed defense instruction at a conference with counsel. After hearing argument, the judge concluded that the instruction would not help the jury, stating:

"This whole thing is premised on the possibility that the jury might find one or more of the defendants guilty of a conspiracy not charged in the indictment. But don't we define the conspiracy charged in the indictment [in other instructions] and isn't it a rather  .    .    . [simple] one count conspiracy indictment, so that the jury knows what it is that they are charged with, and they either find that or acquit them. We have told them that a half a dozen times. My problem is that I am not at all sure that this would contribute to the jury's body of knowledge at all, it would confuse them." July 7, 1975 transcript, p. 76.

In light of the trial judge's well founded comments, we find no error in his refusing the defense instructions dealing with multiple conspiracies. Admittedly, the case law requires an instruction to be given in some situations. However, in this case, where there is a simple one count indictment,

where the crime of conspiracy has been previously outlined in other instructions, and where the evidence shows a single on-going conspiracy, we see no reason to over-rule the decision of a respected trial judge merely to be faithful to our previous decision in *Varelli, supra,* which encourages but does not demand the giving of such an instruction. The trial judge was in the best position to determine whether the evidence created the possibility of a variance. Now, on appeal, from a position of hindsight, we believe his decision was correct in that such an instruction would only confuse the issue before the jury. However, our decision in this case should not be read as discouraging the giving of an instruction when the possibility of a variance clearly exists.[4]

## II. THE COURT DID NOT ERR IN DENYING DEFENDANTS' MOTION FOR A SEVERANCE.

Prior to the trial, all defendants joined in a motion for severance on the ground that the defendants believed the testimony of other defendants would be material to their defense and that a joint trial with any of the defendants named in the indictment would deny them the right to call such as a co-defendant as a witness.

The chief government witness, Thomas, testified that the majority of the sit-downs, where the monies were divided among the vice officers, were held at the home of defendant Richard Weingart. The questions of whether Weingart's home was used as the conspiratorial meeting place and whether Weingart observed any of the defendants receiving monies from Thomas or Benjamin became important issues for the defense.

The motion for a severance was later renewed by an affidavit from defendant Richard Weingart. He stated that he was willing to be a witness on behalf of all defendants to the facts that there were no sit-downs at his house; that neither he nor any of the other defendants, to his knowledge, participated in any conspiracy to extort money from tavern owners; and that he did not observe any of the defendants, including himself, receive monies allegedly collected from these tavern owners.

■ At the beginning of the presentation of the defendants' case, defendant Weingart informed the court that he wished to take the witness stand. At that time, the government told the court of its desire to cross-examine Weingart concerning prior acts of misconduct, admittedly independent

---

4. The defense submitted the following two instructions dealing with the multiple conspiracy problem:

"Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved by the single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit. However, if you are *satisfied that such a conspiracy existed,* you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit the defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy.

If you find that the Government has failed to prove the existence of only one conspiracy you must find the defendants not guilty.

*United States v. Bynum,* 485 F.2d 490 at 497 (2d Cir. 1973)."

The alternative instruction stated:

"Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy. *United States v. Tramunti,* 513 F.2d 1087 (2d Cir. 1975)."

and separate from the conspiracy charged in the indictment. The government stated that the purpose of the introduction of this evidence was solely to demonstrate Weingart's intent, purpose and state of mind. The district court properly ruled that evidence of prior acts would be admissible since Weingart was a defendant and since his intent and state of mind were in issue.

As his affidavit stated, though Weingart was willing to be a witness on behalf of all the defendants, were there not a joint trial, he felt that he could not be a witness in a joint trial when the court had ruled that these alleged prior acts of misconduct could be used against him.

This Court has previously ruled that a single joint trial of several defendants may not be had at the expense of the defendant's right to a fundamentally fair trial. *United States v. Echeles,* 352 F.2d 892 (7th Cir. 1965). But the evidence offered in this case sharply contrasts with the co-defendant's testimony in *Echeles.* There the testimony did not merely counter details of the government's proof: Echeles' sole co-defendant made statements protesting Echeles' innocence. Weingart's proposed testimony in this case would only contradict certain details of the government's proof. Unlike in *Echeles,* the testimony would not amount to a dramatic and convincing exculpation of the co-defendants.

Further, and perhaps more importantly, the defendants' convictions were not based solely upon the testimony of Joseph Thomas, the only witness whom Weingart could have contradicted directly. Numerous tavern owners testified that they made payments directly to Abraham, Henkin and Mulligan.

In order to obtain a severance the defendants must show actual prejudice, *i. e.,* "that [they] will be unable to obtain a fair trial without severance, not merely that a separate trial will offer a better chance of acquittal." *United States v. Blue,* 440 F.2d 300, 302 (7th Cir. 1971); *accord, United States v. Kahn,* 381 F.2d 824, 838 (7th Cir. 1967); *United States v. Bastone,* 526 F.2d 971, 983 (7th Cir. 1975); *United States v.*

*Serlin,* 538 F.2d 737, 743 n. 5 (7th Cir. 1976). In this case co-defendant Weingart's proposed testimony would simply cast doubt upon part of the government's proof. We do not believe that his refusal to testify prevented the defendants from obtaining a fair trial. Simply because a co-defendant's testimony would contradict the government's case does not mandate a severance. *United States v. Braasch,* 505 F.2d 139 (7th Cir.), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975).

III. THE TRIAL COURT DID NOT ERR IN ITS EVIDENTIARY RULINGS AND IN INSTRUCTING THE JURORS.

Defendants assert that the trial court erred in admitting evidence that the defendants received payoffs from "bookies" or gamblers. Such evidence, although prejudicial, is admissible if material and relevant to the charges in the indictment. *United States v. Braasch, supra.* In addition to their above objection, the defendants also requested the trial judge to reopen the *voir dire* of the jurors to determine whether any juror was so biased against gambling that the defendants would be denied a fair trial. In refusing to reopen the *voir dire* the trial judge was acting within his discretion. *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Reviewing the entire record, we see no abuse of the judge's discretion since the references to gambling activities were quite limited.

The defendants also contend that the trial court's refusal to instruct the jury to consider with caution the testimony of an admitted perjurer constituted reversible error. Defendants based their tender of the admitted-perjurer instruction on Thomas' admission that he had not included his share of the extortion payoffs on his income tax returns. The government argues that the court was justified in not giving such an instruction because Thomas never read his returns, which were filed by his attorney, and thus there was no evidence that he willfully lied on the income tax returns. We cannot accept this argument. Every

taxpayer can be held responsible for statements or omissions in an income tax report which he signs. In many instances false statements or omissions can amount to perjury under 18 U.S.C. § 1621.[5] However, in this case we need not decide whether Thomas became a perjurer by signing his income tax return. The only question is whether the jury was advised that the credibility of his testimony might be open to question. We think the jury was sufficiently informed by defense counsel during closing argument and by the court's instruction regarding how jurors are to determine credibility of witnesses.

■ The defendants also objected to the court's giving an instruction that witness Thomas had no reason to lie because he was given immunity. Originally the court refused to give this instruction. Thus, the defense argues, it was a violation of Federal Rule of Criminal Procedure 30[6] for the judge to give the instruction because defense counsel were not informed prior to giving their closing argument. But we think the record is sufficiently clear that the judge warned defense counsel he would still give the immunity instruction should the argument be made that Thomas did not have to tell the truth because he was immunized. After the closing argument the judge once again discussed the immunity instruction issued and concluded:

"My concern for changing my mind on the immunity instruction, occurred after

someone argued—and I don't recall who—that Thomas the perjurer, after he had done his dirty work, would walk out of this courtroom, free, while these other defendants stood trial.

That suggested to me such a strong inference that he was immune from any consequences of his sordid misconduct on the stand, that I thought my warning had been disregarded—my ruling had been disregarded; and that the issue had been raised and that I thought this instruction should be given.

I know I am paraphrasing that argument and not quoting it exactly; but that was the impression I think that was conveyed to the jury." July 9, 1975 transcript, pp. 5–6.

It seems clear that the judge not only informed counsel of his proposed action, but also acted precisely as he had said he would. Consequently we do not think that the spirit or the letter of Rule 30 was violated.

Finally, the defendants argue that two comments by the prosecutor in closing argument constitute reversible error. We have read the prosecutor's argument in its entirety and do not believe the boundaries of zealous advocacy were crossed.

■ In the first instance, the prosecutor made a statement which may have been interpreted by the jury as an argument to buttress Thomas' testimony by interjecting his personal belief that the testimony was credible.[7] We have previously stated in

---

5. 18 U.S.C. § 1621 states, in relevant part:

"Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury. . . ."

6. Rule 30 of the Federal Rules of Criminal Procedure states:

"At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At that

same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury."

7. The prosecutor stated as follows in closing argument:

"You are not even going to remember, necessarily, whose character witnesses went on

*United States v. Phillips,* 527 F.2d 1021, 1023–25 (7th Cir. 1975) that although counsel may properly argue as to the weight and sufficiency of the evidence, and argue the credibility of witnesses' testimony based on the evidence, he may not frame an argument to the jury based on his own personal knowledge or belief that a witness is lying or that a certain defendant is guilty. In this instance we believe that the prosecutor's comment was not of the type condemned in *Phillips.* We do not see it as an attempt to persuade the jury to reach a decision based on personal beliefs rather than the evidence.

■ The second statement can be characterized as an appeal to the jury's sense of the social significance of their verdict.[8] This line of argument is only improper where the government's case lacks substance or hard evidence such as in *Perry v. Mulligan,* 399 F.Supp. 1285 (D.C.N.J.1975). In that case the prosecutor obtained a conviction, in spite of weak evidence, by attempting repeatedly to "[enlist] the jury in a public crusade," combined with an attack on the defendant's attorney. Such a situation did not exist in this instance, and it was not improper for the prosecutor to remind the jurors of the important role they assume in the criminal justice system or the fact that their decision would have an impact within the community.

Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

WILLIAM J. CAMPBELL, Senior District Judge (dissenting).

The "simple one count indictment" in this case charged a conspiracy of seven defendants and others to extort money from tavern owners over a period of approximately ten years. The evidence showed that the monthly pay-off or "package" was divided only among members of the 19th district vice squad, and that the government's principal witness, Thomas, was assigned to that unit from February 1964 through October 1965 and from June 1966 through November 1970. Although each of the seven defendants served as a member of the vice squad during the conspiracy period alleged in the indictment, none served more than three continuous years. From May 1965 through February 1968, it appears that none of the defendants was assigned to the unit, and with the exception of one nine month period when four defendants * served simultaneously, no more than three participated as members of the vice squad at the same time. Appellants Abraham and Henkin served from February 1964 through February and April 1965, respectively, and did not return to the unit until sometime after Thomas' departure in November 1970. Appellant Mulligan did not arrive on the scene until early 1968. He was transferred eighteen months later, several years before the conspiracy allegedly terminated. Seventeen tavern owners testified that payoffs were made to various defendants, over continuous periods of time which, with one exception, did not exceed four years in duration. Two of the alleged co-conspirators were found not guilty; the jury failed to reach a verdict with respect to two others.

I quite agree that the evidence does not show, as a matter of law, the existence of two or more conspiracies. Accordingly, I agree that appellants' convictions should not be set aside on that ground. But surely there exists a fact question regarding whether there was one conspiracy or several, and where such a question exists *United*

first and whose went on second. That is what they are asking you to acquit the defendants on, because Thomas didn't particularize the dates. That argument had no merit. And if that wasn't credible evidence, it wouldn't be before you." July 9, 1975 transcript, pp. 66–67.

**8.** The second statement by the prosecutor which is challenged is as follows:

"And make no mistake about it, your verdict will be heard once in this courtroom, but it will be repeated a number of times. And there are those who watch and await what your verdict is. If it is guilty, those who have like motives and are similarly inclined . . . [objection]." July 9, 1975 transcript, pp. 52–53.

* The jury found one of the four not guilty and failed to reach a verdict as to two others.

*States v. Varelli,* 407 F.2d 735 (7th Cir. 1969) does not simply "encourage" the giving of a multiple conspiracy instruction (as the majority opinion suggests); such an instruction is required:

"Since the existence of multiple conspiracies is really a fact question as to the nature of the agreement, it is for the jury to decide whether there is one agreement or several. *United States v. Crosby,* 294 F.2d 928 (2d Cir. 1961); *Green v. United States,* 332 F.2d 788, 789 (5th Cir. 1964); *United States v. American Honda Motor Company,* 273 F.Supp. 810 (N.D.Ill.1967). Therefore the district judge should not under F.R. of Crim.P. 14 grant a severance . . . but, when the *possibility of a variance* appears, *should instruct* the jury on multiple conspiracies as well." 407 F.2d at 746 (emphasis added).

The majority's observation that the multiple conspiracy instruction might confuse the jury, since they had before them a "simple one count [conspiracy] indictment," is quite beside the point. No doubt, an additional instruction undermining the government's theory of the case would have complicated things a bit, but that is hardly an appropriate basis for denying the defendants an instruction to which they are entitled. After all, it was defendants' theory that the idea of an on-going ten year conspiracy was a little *too* simple.

In my view, the law of this Circuit was established in *Varelli.* Where the "possibility of variance appears," it is "for the jury to decide whether there is one agreement or several." In order that this decision may be made intelligently, the jury should be instructed respecting multiple conspiracies. The other instructions outlining the crime of conspiracy in this case did not satisfy this requirement.