996 F.2d 1217
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dino HOWARD, (92-1566/1567), Frank Bufkin, (92-1608), Marcus
David Cerna, (92-1675), and Donnie Riggs,
(92-1679), Defendants-Appellants.
 Nos. 92-1566, 92-1567, 92-1608, 92-1675 and 92-1679.
 United States Court of Appeals, Sixth Circuit.
 July 2, 1993.
 
 Before: MILBURN and NORRIS, Circuit Judges; and WISEMAN, District Judge.*
 PER CURIAM.
 
 
 1
 In these consolidated cases, defendants Dino Howard (Nos. 92-1566/1567), Frank Bufkin (No. 92-1608), Marcus David Cerna (No. 92-1675), and Donnie Riggs (No. 92-1679) appeal from the judgments of the district court finding them guilty of conspiracy to possess cocaine, cocaine base, and marijuana with the intent to distribute them, a violation of 21 U.S.C. § 846. For the reasons that follow, we affirm the judgments of the district court.
 
 
 2
 On appeal, the issues presented by defendant Dino Howard are: (1) whether the district court abused its discretion when it refused to permit Howard to withdraw his guilty plea, (2) whether Howard's plea agreement should be vacated because the district court failed to establish that his plea was knowingly entered or was supported by a factual basis, (3) whether the district court failed to comply with Federal Rule of Criminal Procedure 32(a)(1)(A), and (4) whether counsel rendered ineffective assistance when she failed to promptly file a motion to withdraw the guilty plea and failed to challenge the presentence investigation report (PSI).
 
 
 3
 Defendant Marcus David Cerna raises two issues on appeal: (1) whether the district court erred in sentencing him under the guidelines in effect after November 1, 1989; and (2) whether the trial court's finding that Cerna was responsible for 500 to 1500 kilograms of cocaine was clearly erroneous.
 
 
 4
 Finally, defendant Donnie Riggs argues on appeal that (1) there was a prejudicial variance between the indictment and the proof presented at trial, (2) the evidence was insufficient to convict him, and (3) the government failed to prove by a preponderance of the evidence that he was responsible for 25 to 35 kilograms of cocaine or that he had a supervisory role in the charged conspiracy.
 
 
 5
 Defendant Frank Bufkin argues on appeal that (1) the trial court committed reversible error in not granting his motion for severance, (2) the evidence was insufficient to prove guilt beyond a reasonable doubt, and (3) the jurors did not follow the instructions given to them by the court at the conclusion of the trial.
 
 I.
 A. Facts
 
 6
 Darryl Thomas, a key participant during most of the period of the conspiracy, began selling drugs in the Detroit area in 1985 and, within a year, was selling kilogram quantities of cocaine. Eventually, he rose to a high position in a drug distribution network that included 20 to 30 people. In 1985 and 1986, Thomas was selling to wholesale customers Kenny High, Duane Moore, and defendants Donnie Riggs and Frank Bufkin. Thomas was arrested after the lounge he owned was raided by the Detroit Police Department in February 1986. However, when the prosecutor refused to identify a confidential informant, the state court dismissed the drug charges against Thomas, who promptly relocated to Houston, Texas. In Houston, Thomas met with a Detroit friend and co-conspirator, Leroy Johnson.
 
 
 7
 In early 1987, Thomas began obtaining cocaine and marijuana through Johnson's Texas connections and sending it by motor vehicle from Houston to Detroit for further distribution. The drugs were hidden behind the taillights or the side panels of these vehicles. Coconspirators William Sabra and Donna Woods served as principal couriers until Woods was placed in charge of "stash" houses in Detroit. Eventually, drugs were also sent by commercial airlines with four or more young women as couriers. Woods made the flight arrangements and made sure that the couriers were met at the airport.
 
 
 8
 Johnson was apprehended in June 1987 in northern Texas while transporting 10 kilograms of cocaine and 23 pounds of marijuana to Detroit. He was jailed for approximately six months before being released in December 1987 on probation. While in jail, Johnson met Juan Cerna. In early 1988, after they were both released, Juan Cerna introduced Johnson to his brother, defendant Marcus David Cerna. Soon thereafter, Marcus David Cerna began supplying Thomas with large quantities of cocaine as often as several times a week. These drugs were transported by ground and air to Detroit. Thomas subsequently testified that in 1988 and the first half of 1989, David Cerna supplied him with over 1000 kilograms of cocaine. Moore and High were Thomas's higher-volume customers, but over 25 kilograms were reportedly delivered to defendant Bufkin. Defendant Donnie Riggs bought no more than one kilogram at a time.
 
 
 9
 In late 1988 and early 1989, several shipments of cocaine and marijuana were intercepted by law enforcement officials. In response to this pressure, Thomas moved from Houston to Las Vegas, where he was arrested in June 1990. Both Thomas and Johnson eventually agreed to cooperate with the government in return for reduced sentences. Shortly thereafter, defendant Marcus David Cerna, unaware of this cooperation, telephoned Johnson to discuss resuming operations. Under Drug Enforcement Administration (DEA) supervision, Johnson then talked to Moore about a possible cocaine deal. Moore sent defendant Dino Howard to negotiate the deal, and DEA agents videotaped the ensuing meeting on January 25, 1991. As a result of the meeting, the Cerna brothers provided four or five kilograms of cocaine to Moore. On March 29, 1991, the Cernas delivered one kilogram of cocaine to Johnson in Houston, at which time DEA agents arrested them.
 
 
 10
 Johnson also arranged a meeting with defendant Bufkin in Southfield, Michigan, which was videotaped by the DEA. At this meeting on February 22, 1991, Bufkin and co-conspirator Andrew Sawyer expressed interest in obtaining more cocaine from Texas. Bufkin also commented that codefendant Giles was still actively distributing cocaine and would buy cocaine in multiple kilogram quantities from Johnson.
 
 B. Procedural History
 
 11
 On July 2, 1991, fourteen persons, including the appellants, were charged in a fifth superseding indictment with conspiring between June 1987 and March 29, 1991, to possess with intent to distribute, and to distribute, cocaine, cocaine base, and marijuana. In addition, count four charged Marcus David Cerna with unlawfully using a telephone to facilitate the conspiracy. (Counts two and three involved codefendants who are not parties to these consolidated appeals.)
 
 
 12
 Defendant Marcus David Cerna pled guilty to count one on January 27, 1992. In return, the government agreed to dismiss count four and to recommend a two-level reduction in offense level for acceptance of responsibility. The plea agreement further provided for a 293-month cap on Cerna's prison sentence and for no upward or downward departures. There was no agreement as to drug quantity or duration of the conspiracy, and both sides presented to the court their respective positions on these disputed sentencing factors. At the April 28, 1992, sentencing proceeding, the district court found that Cerna was responsible for over 1000 kilograms of cocaine and that the conspiracy continued until 1991. Because the conspiracy continued into 1991, the district court applied the United States Sentencing Guidelines ("U.S.S.G.") that became effective on November 1, 1989. Cerna was sentenced to 276 months imprisonment, given five years of supervised release, and fined $1,500,000. The district court further recommended that Cerna be deported upon completion of his prison term.
 
 
 13
 Defendant Dino Howard entered a guilty plea to count one on February 6, 1992, the morning the consolidated trial was to begin. However, on April 27, well after his codefendants' trial had been completed and the day before his own sentencing, Howard filed a motion to set aside his guilty plea. The district court denied the motion to withdraw and, on April 28, 1992, sentenced Howard to 180 months imprisonment and five years supervised release.
 
 
 14
 Five defendants, including appellants Bufkin and Riggs, went to trial on February 7, 1992. On February 25, 1992, the jury returned a verdict of guilty as to defendants Bufkin, Riggs, and Giles and a verdict of not guilty as to defendants Jackson and Villanueva. Bufkin was sentenced on May 7, 1992, to 160 months imprisonment and five years of supervised release. On May 19, 1992, the district court sentenced Riggs to a prison term of 188 months and five years supervised release.
 
 
 15
 Defendants Howard, Cerna, Bufkin, and Riggs each timely filed a notice of appeal. Howard subsequently filed a second notice of appeal which challenged the same judgment. These appeals were consolidated for decision.
 
 II. Howard
 A. Withdrawal of Guilty Plea
 
 16
 The district court did not abuse its discretion when it refused to allow defendant Howard to withdraw his guilty plea. It is well settled that the withdrawal of a guilty plea prior to sentencing is not an absolute right but lies within the sound discretion of the trial judge. United States v. Alexander, 948 F.2d 1002, 1003 (6th Cir.1991) (per curiam), cert. denied, 112 S.Ct. 1231 (1992); United States v. Spencer, 836 F.2d 236, 238 (6th Cir.1987). The burden is upon the movant to establish a fair and just reason for withdrawal of his plea. Id. at 240.
 
 
 17
 This court has enumerated a number of factors that a district court may consider when evaluating whether a defendant has established, pursuant to Fed.R.Crim.P. 32(d), a "fair and just reason" to withdraw his guilty plea. They are: (1) whether the movant asserted a defense or has consistently maintained his innocence; (2) the length of time between the entry of the plea and the motion to withdraw; (3) why the grounds for withdrawal were not presented to the court at an earlier time; (4) the circumstances underlying the entry of the guilty plea, the nature and background of the defendant, and whether the defendant has admitted his guilt; and (5) potential prejudice to the government if the motion to withdraw is granted. United States v. Goldberg, 862 F.2d 101, 103-04 (6th Cir.1988); Spencer, 836 F.2d at 238-40. Prejudice to the government need not be established or considered unless and until the court determines that the defendant has established a fair and just reason for vacating his plea. Alexander, 948 F.2d at 1004. A strategic miscalculation by the defendant does not provide grounds for setting aside an otherwise valid guilty plea. United States v. Broce, 488 U.S. 563, 571 (1989).
 
 
 18
 An examination of these factors shows that Howard has not met his burden of proof. Howard has not consistently maintained his innocence. On February 6, 1992, he stated under oath that he was guilty of conspiracy. A solemn declaration of guilt by the defendant carries a presumption of truthfulness. Blackledge v. Allison, 431 U.S. 63, 74 (1977). Howard has not overcome this presumption. Although there may be some disagreement as to the extent of his involvement in the conspiracy, his admissions that he counted the money involved in at least one drug transaction and negotiated another cocaine deal are sufficient to support his plea. Howard's subsequent unsworn protestations of innocence are not persuasive.
 
 
 19
 The district court itself was "disturbed" by the timing of Howard's motion to withdraw. Howard pled guilty on the morning his trial was scheduled to commence. His motion to withdraw was filed some 50 days later, the day before his sentencing and after the trial of his codefendants had ended. Although Howard's counsel took responsibility for the late filing, asserting that Howard had first requested that the plea be withdrawn the day after it was entered, the timing appears to be strategic because the granting of the motion to withdraw would have achieved the same result sought by Howard in his unsuccessful motion for severance. It is difficult to credit counsel's excuse for not filing a motion earlier--she "didn't believe initially that Mr. Howard wanted to proceed with this motion,"--in light of her earlier diligence in filing various pretrial motions.
 
 
 20
 Howard offers no valid reason why his grounds for withdrawal were not presented earlier. In his motion to withdraw the plea, he alleged that his plea was not voluntarily given but was based on outside pressures from codefendants. He also argued that the factual basis provided for the plea was not based upon his personal knowledge. Both assertions are contradicted by Howard's sworn statements at the time of his guilty plea. In response to the court's interrogation, he stated that he was not pleading guilty because of pressure or duress and that he knowingly counted drug proceeds for codefendant Moore in return for $1,000.
 
 
 21
 Finally, the circumstances surrounding the plea indicate that it was voluntarily and knowingly given, as discussed in the following subsection. Moreover, because Howard has failed to establish a fair and just reason to vacate his guilty plea, it is unnecessary for the government to establish prejudice. See Alexander, 948 F.2d at 1004. Thus, the district court did not abuse its discretion when it denied Howard's motion to withdraw his guilty plea.
 
 B. Validity of the Plea
 
 22
 The totality of the circumstances surrounding Howard's plea of guilty indicates that it was entered voluntarily, knowingly, and intelligently. It is therefore constitutionally valid. See Brady v. United States, 397 U.S. 742, 749 (1970); and Boykin v. Alabama, 395 U.S. 238, 242-44 (1969). A factual basis for a guilty plea is not required by the Constitution; that requirement stems only from Fed.R.Crim.P. 11. United States v. Timmreck, 441 U.S. 780, 783 (1979). This requirement was met in this case.
 
 
 23
 On February 6, 1992, Howard entered into a Rule 11 plea agreement wherein he agreed to plead guilty to count one of the indictment. In return, the government agreed to a two-level reduction for acceptance of responsibility, a 188-month sentence cap, and a motion for downward departure to a sentence not to exceed 96 months upon a determination of substantial assistance. During its colloquy with defendant, the district court determined directly that defendant understood the charge, the maximum and mandatory minimum penalties, and the rights he was waiving, and that he was acting under no other promises or threats. Under oath, Howard told the court that he was pleading guilty because he was guilty. Moreover, the district court elicited from the defendant a factual basis for the plea. Howard stated that he was paid to count drug money for Duane Moore and admitted meeting with an individual from Texas (Leroy Johnson) to negotiate a drug deal at Moore's direction. There is simply no merit to Howard's claim on appeal that his plea was not knowing or voluntary, or that it lacked a basis in fact.
 
 C. Rule 32(a)(1)(A)
 
 24
 The district court substantially complied with the requirement of Fed.R.Crim.P. 32(a)(1)(A) which requires the court to "determine that the defendant and defendant's counsel have had the opportunity to read and discuss the presentence investigation report...." Contrary to Howard's belief, this rule does not require the district court to ask the defendant personally if he has read and discussed the report with counsel. Instead, this court has held that a district court need only somehow determine that defendant and counsel have had an opportunity to read and discuss the presentence investigation report (PSI) prior to sentencing. See United States v. Stevens, 851 F.2d 140, 143 (6th Cir.1988). The district court may make this determination from reasonable inferences. Id. at 144.
 
 
 25
 In this case, there is abundant evidence that Howard and his attorney had the opportunity to read and discuss the PSI. First, the addendum to the PSI certifies that it was provided to the defendant and his counsel and that no objections had been filed. More importantly, the district court asked counsel at sentencing if she had reviewed the PSI with her client. Counsel answered affirmatively and defendant did not dispute this answer. Furthermore, counsel proceeded to discuss aspects of the PSI and objections which clearly implied a review with her client. Thus, the district court substantially complied with Rule 32(a)(1)(A), and Howard's claim is meritless. See United States v. Schultz, 855 F.2d 1217, 1225 (6th Cir.1988).
 
 
 26
 Assuming arguendo that the district court committed a technical violation of Rule 32 by failing to interrogate defendant personally, the error would be harmless in light of Howard's failure to demonstrate that erroneous information in the PSI was relied on by the district court in sentencing. See Stevens, 851 F.2d at 143. The disputes raised at sentencing were resolved by the district court at that time. Howard identifies no additional alleged inaccuracies in his appellate brief.
 
 D. Ineffective Assistance of Counsel
 
 27
 Finally, defendant Howard argues that his trial counsel rendered ineffective assistance when she failed to promptly file a motion to withdraw his guilty plea and also failed to adequately challenge the PSI. "As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." United States v. August, 984 F.2d 705, 711 (6th Cir.1992) (per curiam) (quoting United States v. Wunder, 919 F.2d 34, 37 (6th Cir.1990)). "The customary procedure followed in this situation by the various circuits is to permit the defendant to raise his ineffectiveness of counsel claim in a proper post-conviction proceeding under 28 U.S.C. § 2255. When, however, the record is adequate to assess the merits of the defendant's allegations, some courts will consider them." Id. Because the decision whether and when to file a motion to withdraw a guilty plea involves strategic decisions, and because the record does not reveal the timing and content of any discussions Howard and his counsel may have had regarding withdrawal of his plea, we will not consider Howard's ineffective assistance claim at this time.
 
 III. Cerna
 A. Duration of the Conspiracy
 
 28
 Defendant Marcus David Cerna first argues that the district court erred in finding that the cocaine and marijuana distribution conspiracy continued until the spring of 1991. The effect of this finding was to make the sentencing guidelines of November 1, 1989, applicable to Cerna, and these guidelines resulted in a longer sentence than he would have received if the conspiracy had ended in the summer of 1989, as Cerna contends.[1] The probation officer suggested in his presentence report that the conspiracy effectively ended by the summer of 1989 with the arrests of several key conspirators. Defendant contends that any activity occurring in early 1991, including the DEA-monitored delivery of cocaine from Cerna to Johnson, was entirely separate from and unconnected with the charged conspiracy.
 
 
 29
 On the other hand, the government argues that Cerna's 1991 delivery was undertaken in furtherance of the same continuing conspiracy and that the period of quiescence was merely a temporary suspension of activity. The district court's determination that the conspiracy did not end until 1991, as charged in the fifth superseding indictment, is a finding of fact subject to the clearly erroneous standard of review. See United States v. Perez, 871 F.2d 45, 47-48 (6th Cir.), cert. denied, 492 U.S. 910 (1989). We conclude that the district court did not clearly err in making this finding.
 
 
 30
 The question of when a particular conspiracy ends depends upon the facts of that case. United States v. Silverstein, 737 F.2d 864, 867 (10th Cir.1984). We have held that where a conspiracy contemplates a continuity of purpose and a continued performance of activity, the conspiracy is presumed to exist until there has been an affirmative showing that the defendant has withdrawn. United States v. Hamilton, 689 F.2d 1262, 1268 (6th Cir.1982), cert. denied, 459 U.S. 1117 (1983). Defendant Cerna does not argue that he affirmatively withdrew from the conspiracy. Rather, he relies on the arrests of Thomas and Johnson and the gap of approximately 21 months in overt acts to show that the charged conspiracy had ended before the November 1, 1989, guidelines took effect. The mere passage of time, however, does not fragment a single conspiracy. United States v. Lokey, 945 F.2d 825, 840 (5th Cir.1991); Hamilton, 689 F.2d at 1269 n. 3. Nor does the arrest of some of its members necessarily terminate a conspiracy. United States v. Robinson, 956 F.2d 1388, 1394 (7th Cir.), cert. denied, 113 S.Ct. 654 (1992); United States v. DeLeon, 641 F.2d 330, 334 (5th Cir.1981). Courts have recognized that conspirators may temporarily cease operations for a variety of reasons without signalling the end of the conspiracy. United States v. DeVarona, 872 F.2d 114, 119 (5th Cir.1989) (10-month gap in overt acts); United States v. Leavis, 853 F.2d 215, 218 (4th Cir.1988) (8-month gap; a single overall agreement need not be manifested by continuous activity).
 
 
 31
 Both Cerna and the government cite the case of United States v. Napue, 834 F.2d 1311 (7th Cir.1987), to support their respective positions. In Napue, the Seventh Circuit did not find it necessary to decide whether a single conspiracy or multiple conspiracies existed where the government proved overt acts that were separated by two and a half years. Nonetheless, the court registered its concerns:
 
 
 32
 Although we do not necessarily reject the government's characterization, we are troubled by the lapse of some two and a half years between the May 1974 sale and the sale to Wilson in the latter part of 1976. The relationship among Napue, Martinez and Torres terminated following the May 1974 sale. The only one of the 1974 conspirators who seems still to have been associated with Napue in 1976 is his wife, who apparently was buying guns for him from 1974 through 1976. Evidence of a time gap, or the existence of periods in which a defendant was not actively conspiring in the conspiracy, is not necessarily fatal to a theory of a single, continuous conspiracy. United States v. Abraham, 541 F.2d 1234, 1237 (7th Cir.1976), cert. denied, 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 552 (1977). Nonetheless, when the period is as long as the one here, we think the government should consider carefully how it will characterize its case in an indictment. The government cannot weave a unitary scheme from episodes that are "so far apart and so differently peopled as to destroy any semblance of relationship." United States v. Goss, 329 F.2d 180, 183 (4th Cir.1964).
 
 
 33
 Napue, 834 F.2d at 1333. This quotation demonstrates that the facts before the Napue court differ markedly from the facts in this case in one important respect. In Napue, the 1976 conspirators differed in identity from the 1974 conspirators.
 
 
 34
 In deciding whether a number of overt acts over time constitute a single conspiracy, key factors include (1) the existence of a common goal, (2) the nature of the scheme, and (3) an overlap in participants. United States v. Maceo, 947 F.2d 1191, 1196 (5th Cir.1991), cert. denied, 112 S.Ct. 1510 (1992). Degree of continuity is, of course, an additional factor to be considered. United States v. Goff, 847 F.2d 149, 166 (5th Cir.), cert. denied, 488 U.S. 932 (1988). When the facts of this case are examined in light of these factors, it cannot be said that the district court could not have found a single continuing conspiracy. The common goal of the conspirators in 1988 as well as in 1991 was to transport cocaine and marijuana from Houston to Detroit for distribution. The monitored discussions establish that, rather than a new arrangement being formed, the old one was being resumed, with drugs being supplied by and distributed to the same persons as before, necessarily excepting those who had been arrested. Although the time gap in this case is substantial, it is insufficient by itself for us to find that the district court clearly erred in finding that the other factors outweighed it. Because the district court did not err in finding that the conspiracy continued until 1991, it did not err in applying the sentencing guidelines that went into effect on November 1, 1989.
 
 B. Quantity of Cocaine
 
 35
 Defendant Cerna also challenges the quantity of drugs attributed to him for sentencing purposes. In particular, he argues that the district court erred in relying on evidence of drug quantities presented at the trial of his coconspirators. Cerna contends that the court should have limited its consideration to the amounts admitted by him during his plea proceeding.
 
 
 36
 The quantity of drugs attributable to a defendant is a fact to be found by the sentencing judge during the sentencing process. United States v. Prior, 941 F.2d 427, 430 (6th Cir.), cert. denied, 112 S.Ct. 613 (1991). The district court's findings of fact regarding drug quantity are reviewed under a clearly erroneous standard. 18 U.S.C. § 3742; United States v. Williams, 962 F.2d 1218, 1226 (6th Cir.), cert. denied, 113 S.Ct. 264 (1992). The prosecution need only prove the quantity of drugs by a preponderance of the evidence. United States v. Davis, 981 F.2d 906, 911-12 (6th Cir.1992), cert. denied, 61 U.S.L.W. 3772 (U.S., May 17, 1993) (No. 92-7927).
 
 
 37
 Cerna's argument that the district court erred in relying upon trial testimony is meritless. This court has held that when a defendant has pleaded guilty, The United States Constitution does not mandate confrontation and cross-examination on sentencing information submitted to the court and that even hearsay which bears an "indicia of reliability" may be considered. United States v. Silverman, 976 F.2d 1502, 1510-11 (6th Cir.1992) (en banc), cert. denied, 113 S.Ct. 1595 (1993). "Following the mandates of Fed.R.Crim.P. 32 is constitutionally sufficient because they are fundamentally fair and afford the defendant adequate due process protections." Id. at 1510 (emphasis in original). Cerna acknowledges that he was provided with transcripts of the trial testimony (Appellant Cerna's Brief at 11), and he does not argue that the sentencing court did not comply with Rule 32. In this case, the testimony relating to drug quantity was given under oath and was subject to cross-examination, albeit not by Cerna. It thus bears "indicia of reliability" sufficient to permit its use without impinging on Cerna's due process rights. Id. at 1513.
 
 
 38
 The evidence presented clearly supports the district court's finding that defendant David Cerna was responsible for at least 500 kilograms of cocaine. Darryl Thomas testified that Cerna was the conspiracy's primary source of cocaine in 1988 and 1989. He estimated that Cerna supplied him with "at least a thousand kilos" during that time. J.A. 344. Cocaine was in plentiful supply and Thomas was sending shipments to Detroit at least once a week and up to 12 or 13 times a month. Donna Woods testified that as many as three suitcases of cocaine would be shipped at a time with 6-10 kilograms per suitcase. At times there were three to five shipments in one week. Cerna himself, testifying during his plea proceeding, admitted to selling "up to 500, 400, 5" kilograms of cocaine in 1988 and 1989. J.A. 236-37. Thus, the district court's finding that Cerna provided a conservative estimate of the drugs he sold and that the true figure was somewhere between Cerna's estimate of "up to 500" and Thomas's estimate of 1000 kilograms is not clearly erroneous.
 
 
 39
 Moreover, this finding does not take into consideration the unspecified quantity of marijuana that Cerna admitted to selling. See Williams, 962 F.2d at 1227 ("Under U.S.S.G. § 1B1.3, the district court must consider all quantities of drugs involved in the same conspiracy."). The amount of marijuana seized by law enforcement officers on April 7, 1989, alone was 78 pounds. Accordingly, the government met its burden of proof in establishing the quantity of 500 to 1500 kilograms of cocaine necessary to support Cerna's base offense level of 40.
 
 IV. Riggs
 
 40
 A. Variance Between Indictment and the Proof
 
 
 41
 Defendant Riggs argues that there was a prejudicial variance between the single conspiracy charged in the indictment and the proof at trial, which allegedly showed only his involvement in a separate, smaller conspiracy. Whether a single conspiracy or multiple conspiracies have been proven is a question of fact to be resolved by the jury. United States v. Hughes, 895 F.2d 1135, 1140 (6th Cir.1990). The key question is whether "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Paulino, 935 F.2d 739, 748 (6th Cir.), cert. denied, 112 S.Ct. 315, 323, 660, and 883 (1991). "Further, in a 'chain conspiracy,' such as the one at issue here, it is enough that each member of the conspiracy realizes that he is participating in a joint enterprise, even if he does not know the identities of many of the participants." Id.
 
 
 42
 We recently discussed the same issue Riggs now raises:
 
 
 43
 If an indictment alleges one conspiracy, but the evidence can be construed as only supporting a finding of multiple conspiracies, a variance results. United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982). However, even if a variance exists, it does not constitute reversible error "unless it prejudice[s] [the defendant's] substantial rights." United States v. Guerra-Marez, 928 F.2d 665, 671 (5th Cir.), cert. denied, 112 S.Ct. 322 and 112 S.Ct. 443 (1991) (quoting United States v. Richerson, 833 F.2d 1147, 1154-55 (5th Cir.1987)). Moreover, "[i]f the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." Guerra-Marez, 928 F.2d at 672 (quoting United States v. L'Hoste, 609 F.2d 796, 801 (5th Cir.), cert. denied, 449 U.S. 883 (1980)).
 
 
 44
 United States v. Lee, 991 F.2d 343, 349 (6th Cir. April 20, 1993).
 
 
 45
 The conspiracy charged in Lee was similar to that alleged in the indictment in this case. It involved the shipment of cocaine from a supplier in Miami to a principal distributor, Dortch, in Detroit. Defendant Lee's main role in the conspiracy was to assist Dortch in the distribution of the drugs to his customers in Detroit. We held that
 
 
 46
 [a]lthough Dortch may have had several "customers" in the Detroit area, each of these customers were part of the same "chain" conspiracy, the object of which was the transportation of cocaine from Florida to Michigan and the distribution of the cocaine in the Detroit area. Thus, defendant's assertions that the government proved the existence of multiple conspiracies rather than a single conspiracy and that, as a consequence, a variance resulted between the charges in the indictment and the evidence presented at trial are meritless.
 
 
 47
 Id.
 
 
 48
 Similarly, even though defendant Riggs was only one of Thomas' customers who further distributed the drugs on the street, he was part of the overall conspiracy to transport cocaine and marijuana from Houston to Detroit for further sale. The proof at trial established that Riggs was not, as he contends, at the end of the chain and, thus, an end-user. Rather, the reference to his workers and the inference of resale from his purchase of kilogram quantities shows that his role was that of a "middle-man."
 
 
 49
 Moreover, trial testimony established that Riggs was aware of other members of the conspiracy and, to some extent, their roles. Donna Woods testified that Riggs picked up cocaine from her apartment in Detroit. Leroy Johnson stated that he was introduced to Riggs on occasions when he went to Detroit between December 1987 and August 1988. Finally, Duane Moore testified that, in the course of picking up his own drugs, he got to know other customers of Thomas, including Riggs. See United States v. Miley, 513 F.2d 1191, 1207 (2d Cir.) (single conspiracy will be upheld where the evidence "permit[s] the inference that the persons at a particular level must have known that others were performing similar roles"), cert. denied, 423 U.S. 842 (1975).
 
 
 50
 In this case, the district court fully instructed the jury on the possibility of multiple conspiracies. The evidence supports the jury's conclusion that the government established a single chain conspiracy and that Riggs was a link in it. There was no prejudicial variance.
 
 B. Insufficient Evidence
 
 51
 Riggs also argues that the evidence was insufficient to establish his guilt of the conspiracy charged.[2] He contends that the evidence, at best, shows him to be guilty only of a separate, smaller conspiracy.
 
 
 52
 In reviewing a challenge to the sufficiency of the evidence, this court determines whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Head, 927 F.2d 1361, 1365 (6th Cir.), cert. denied, 112 S.Ct. 144 (1991). In making this determination, circumstantial evidence is entitled to the same weight as direct evidence. United States v. Frost, 914 F.2d 756, 762 (6th Cir.1990) (citing Holland v. United States, 348 U.S. 121, 140 (1954)). Further, "the uncorroborated testimony of an accomplice may support a conviction under federal law." Frost, 914 F.2d at 762 (quoting United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985), cert. denied, 474 U.S. 1068 (1986)). Further, this court will not remake credibility determinations. "It is for [jurors] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." Gallo, 763 F.2d at 1518 (quoting United States v. Bailey, 444 U.S. 394, 414-15 (1980)).
 
 
 53
 When the evidence is viewed in this light, it is clear that a rational jury could easily have found defendant Riggs guilty of taking part in the charged conspiracy to distribute cocaine and marijuana. Darryl Thomas, one of the highest-ranking members of the conspiracy, testified that he personally delivered drugs to Riggs. He further testified that Riggs, while not a high-volume customer, nonetheless received one or two kilograms of cocaine per delivery and that a few pounds "here and there" of marijuana would go to Riggs. Donna Woods also testified that Riggs was one of the customers who would pick up cocaine approximately once every two weeks from the "stash" house she managed. Further testimony regarding Riggs's involvement was presented by Leroy Johnson and Duane Moore. Assuming that the jury found these witnesses to be credible, there was ample evidence to convict Riggs of conspiracy to distribute cocaine and marijuana. Moreover, as discussed above, the jury could reasonably have found the existence of a single conspiracy and rejected Riggs' claim of a separate, smaller conspiracy.
 
 C. Quantity of Cocaine/Supervisory Role
 
 54
 The district court's findings that defendant Riggs was responsible for between 25 and 35 kilograms of cocaine and that he had a supervisory role in the conspiracy are not clearly erroneous. The prosecution must prove the quantity of drugs attributable to Riggs and his supervisory role by a preponderance of the evidence. See Davis, 981 F.2d at 911-12; United States v. Castro, 908 F.2d 85, 90 (6th Cir.1990).
 
 
 55
 Pursuant to U.S.S.G. § 1B1.3(a)(2), the entire quantity of drugs attributable to a distribution enterprise is included in determining the base offense level of a conspirator. See United States v. Blankenship, 954 F.2d 1224, 1228 (6th Cir.), cert. denied, 113 S.Ct. 288 (1992). However, the Commentary to the guideline observes that, in the case of a conspiracy which includes the conduct of many participants over a substantial period of time, relevant conduct is not necessarily the same for every participant. U.S.S.G. § 1B1.3, comment. (n. 1). The district court attributed to Riggs only the quantity of drugs shown by a preponderance of the evidence to have been delivered to him personally.
 
 
 56
 Riggs was portrayed at trial as a relatively low-volume customer of Darryl Thomas. Thomas testified that Riggs purchased only about one kilogram of cocaine at a time. Riggs points out, however, that Thomas did not testify as to the number of one-kilogram purchases made, and he argues that the 25-kilogram estimate was a mere guess insufficient to establish a base offense level. See Davis, 981 F.2d at 911.
 
 
 57
 Riggs argued at sentencing that he could reasonably be held responsible only for between two and seven kilograms of cocaine. However, the district court could easily have found that Riggs purchased at least 25 kilograms because Thomas testified that in 1988 and 1989, Riggs was getting a "regular amount" of one or two kilograms per delivery. Thomas also testified that Riggs was his regular customer and that Thomas was making 12 or 13 deliveries a month to Detroit during 1988 and 1989. If Riggs received even one delivery per week for twelve months, he would have received many more than the 25 kilograms he was held responsible for.
 
 
 58
 Donna Woods testified that, during a five to seven-month period, Riggs picked up a kilogram of cocaine from her apartment about once every two weeks. This statement would account for 10 to 14 kilograms during that time period alone. Although Leroy Johnson testified that the amounts purchased by Riggs were closer to half-kilograms than kilograms, the district court could have placed more weight on the estimates of Thomas and Woods, who were more directly involved in the distribution to Riggs than was Johnson. Thus, the district court did not clearly err in basing Riggs' offense level upon 25 to 35 kilograms of cocaine.
 
 
 59
 In addition, there was no clear error in the district court's finding that Riggs played a supervisory role in the conspiracy. Thomas' testimony placed him over a number of "couriers," "guys on the street." J.A. 343. Moreover, Woods testified that when Riggs picked up cocaine, he would bring along someone else and would hand the drugs to that person. There was no evidence presented either at trial or at sentencing to the contrary and the evidence thus supports the district court's two-level enhancement of Riggs' sentence pursuant to U.S.S.G. § 3B1.1(c).
 
 
 60
 Finally, like Cerna, Riggs objects to the district court's reliance on trial testimony and hearsay in establishing his offense level. Like Cerna, his argument fails for the same reasons.
 
 V. Bufkin
 A. Motion for Severance
 
 61
 Defendant Bufkin argues that the district court abused its discretion when it denied his motion for severance. See Opper v. United States, 348 U.S. 84, 95 (1954); United States v. Davis, 809 F.2d 1194, 1207 (6th Cir.), cert. denied, 483 U.S. 1007 and 1008 (1987). The general rule is that defendants who are jointly indicted should be tried together. Id. at 1207. This rule is particularly applicable to cases involving conspiracy. See United States v. Horton, 847 F.2d 313, 317 (6th Cir.1988). "In order to escape the general rule, the defendant 'must carry the heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials." Davis, 809 F.2d at 1207 (quoting U.S. v. Pickett, 746 F.2d 1129, 1134 (6th Cir.1984), cert. denied, 469 U.S. 1226 (1985)). The mere fact that each defendant "points the finger" at another is insufficient to show prejudice sufficient to warrant severance. Horton, 847 F.2d at 317. Instead, the defendant must show that the jury is unable to separate and to treat distinctively evidence that is applicable to each particular defendant. Id.; Gallo, 763 F.2d at 1524.
 
 
 62
 Bufkin has not met this standard. To support his motion for severance, he offered only general and conclusory statements regarding potential prejudice from the possible admission of a codefendant's statement without the opportunity to cross-examine, antagonistic defenses, and the spillover of evidence aimed at codefendants. Even on appeal, Bufkin fails to identify any specific prejudice, stating only that "the defenses advanced by the codefendants at trial reflected unfairly on Frank Bufkin." Appellant Bufkin's Brief at 17. This falls far short of the "specific and compelling" prejudice required to reverse the district court's decision.
 
 B. Insufficient Evidence
 
 63
 Defendant Bufkin next argues that the evidence presented by the government was insufficient to prove his guilt beyond a reasonable doubt. This argument is meritless.
 
 
 64
 Bufkin's role in the conspiracy as one of Thomas' customers was described by the same witnesses who testified as to Riggs' involvement; viz., Thomas, Johnson, and Moore. Moreover, the government presented in evidence a videotape and an audiotape that graphically demonstrated Bufkin's knowledge of and involvement in the conspiracy. Special Agent Brian Haltom, the primary investigator in this case, also described his observations of Bufkin's meeting with Johnson to negotiate further cocaine transactions on February 22, 1991. Bufkin's argument that this testimony could not prove his guilt beyond a reasonable doubt because those testifying were doing so as government agents or informants is utterly without merit. See Gallo, 763 F.2d at 1518.
 
 C. Failure of Jury to Follow Instructions
 
 65
 Finally, defendant Bufkin argues that the jury did not follow the court's instruction that "[p]roof on [sic] an agreement between a defendant and a Government agent or an informer alone, will not be sufficient to prove a conspiracy." His theory is that the only witnesses who tied him to the conspiracy, principally Thomas and Johnson, testified in exchange for reduced sentences. Their plea agreements, according to Bufkin, made them government agents or informers within the meaning of the court's instruction. Bufkin also argues that, because the videotaped meeting between him and Johnson was arranged while Johnson was cooperating with the DEA, Johnson was not a true coconspirator. Therefore, this evidence was insufficient to prove a conspiracy under the court's instruction. To support his argument, which is really a challenge to the sufficiency of the evidence, Bufkin cites United States v. Barboa, 777 F.2d 1420, 1422 (10th Cir.1985) ("[T]here can be no indictable conspiracy involving only the defendant and government agents or informers"). See also United States v. Pennell, 737 F.2d 521, 536 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985). ("[P]roof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction").
 
 
 66
 Bufkin's argument fails because the rule that government agents do not count as coconspirators is limited to situations in which the conspiracy involves only one defendant and a government informer. See United States v. Giry, 818 F.2d 120, 126 (1st Cir.), cert. denied, 484 U.S. 855 (1987). The fact that a coconspirator withdraws from the conspiracy and becomes a government informant does not terminate the conspiracy if at least two private coconspirators remain. United States v. Miranda-Ortiz, 926 F.2d 172, 175 (2d Cir.), cert. denied, 112 S.Ct. 347 (1991). Although recorded conversations between the defendant and an informer or agent cannot establish a conspiracy, they may be used as evidence of a conspiracy between the defendant and other conspirators. United States v. Esparsen, 930 F.2d 1461, 1472 n. 11 (10th Cir.1991), cert. denied, 112 S.Ct. 882 (1992); United States v. Elledge, 723 F.2d 864, 866 (11th Cir.1984).
 
 
 67
 In this case, the government proved that Bufkin was involved in the conspiracy before Thomas and Johnson began cooperating with the government. It also demonstrated that the conspiracy was capable of continuing after Thomas' arrest and even after Johnson began cooperating with the government. Consequently, the jury could conscientiously follow the court's instructions and find that Bufkin participated in a true conspiracy to distribute drugs.
 
 VI.
 
 68
 For the reasons stated, the judgments of the district court are AFFIRMED in all respects.
 
 
 
 *
 Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 The guidelines in effect prior to November 1, 1989, provided for a maximum base offense level of 36 for cocaine-related offenses involving 50 kilograms or more of cocaine. However, the guidelines that took effect on November 1, 1989, provided for longer sentences where large amounts of drugs were involved. Under the latter guidelines, as applied to defendant Cerna, a base offense level of 40 is required for offenses involving at least 500 but less than 1500 kilograms of cocaine
 
 
 [2]
 Riggs moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29 upon completion of the government's proof and again at the close of all evidence